UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. AHMED BASHIR,<br><br>                    Plaintiff,<br><br>      v.<br><br>THE BOEING COMPANY et al.,<br><br>                    Defendants. | CASE NO. 2:19-CV-00600-LK<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |

This is a qui tam action under the False Claims Act ("FCA"). *See* 31 U.S.C. §§ 3729, 3730(b)(1). Relator-Plaintiff Ahmed Bashir alleges a conspiracy between Boeing and its subcontractor, GDC Technics, LLC, to defraud the United States Government in connection with two programs for constructing and maintaining the Air Force One fleet. He contends that Boeing made knowingly false representations and certifications to the Government about GDC's foreign ownership and financial insolvency; GDC's acquisition of performance bonds and "technical and engineering experience"; GDC's prioritization of projects involving Saudi aircraft above the Air Force One Programs; and GDC's "misappropriation of U.S. Government funds" to complete

"multiple aircraft" owned by the Saudi Government. Dkt. No. 61 at 3. Bashir also identifies over 25 miscellaneous federal regulations Boeing allegedly violated and then falsely certified compliance with. *Id.* at 11–18, 28–29, 31–33; *see also* Dkt. No. 77 at 17–23 & n.11–22 (cataloguing regulations cited in amended complaint). According to Bashir, Boeing knew about these "disqualifying factors" before it "unlawfully" awarded GDC the subcontract for the Air Force One Programs and each time it "illegally sought and obtained payment from the U.S. Government" for the Air Force One Programs. Dkt. No. 61 at 3–4.

The Government twice declined to intervene in this action. Dkt. Nos. 24, 73; *see* 31 U.S.C. § 3730(b)(2), (b)(4)(B), (c)(3). And Bashir voluntarily dismissed GDC from this lawsuit in December 2022. Dkt. Nos. 82–84. Defendants Boeing and Jerry Dunmire have now moved to dismiss Bashir's amended complaint with prejudice for failure to meet the plausibility and particularity standards set forth in Federal Rules of Civil Procedure 8(a) and 9(b). Dkt. No. 77 at 8–9. They also contend that, in any event, Bashir's complaint must be dismissed pursuant to the FCA's public disclosure bar. *Id.* at 9; *see* 31 U.S.C. § 3730(e)(4)(A). The Court grants the motion for the reasons discussed below.[1] Bashir may, however, amend his complaint.

## I.   BACKGROUND

Boeing has a prime contract with the United States Air Force to perform maintenance and repair work on the Air Force One fleet: two Boeing 747-200 jetliners that are the "military version of the Boeing 747 airliner" and "highly modified to serve as the flying National Command Center for the President of the United States." Dkt. No. 61 at 7; Dkt. No. 77 at 9. The Air Force has designated this fleet "VC-25A," and the parties and the Court refer to Boeing's associated maintenance contracts as the "VC-25A Program." Dkt. No. 61 at 7; Dkt. No. 77 at 9. Faced with

---

[1] Because the Court can decide the matter based on the parties' filings, it denies Defendants' request for oral argument.

mounting "capability gaps" and "rising maintenance costs," Congress authorized construction of two new Boeing 747s to replace the increasingly obsolescent VC-25A fleet. Dkt. No. 61 at 7. The "design, development, completion, and delivery" of the next generation of Air Force One is referred to as the "VC-25B Program." *Id.*; Dkt. No. 77 at 10. In July 2018, the Air Force awarded Boeing the prime contract for the VC-25B Program. Dkt. No. 61 at 8 & n.12. The contract is worth $3.9 billion. *Id.*

Boeing does not typically design or install the interiors of the aircraft it manufactures. *Id.* at 8. Instead, it subcontracts with third parties to do so. *Id.* Enter GDC Technics. The Saudi Arabian Government owned and operated GDC for most of the period relevant to this suit. *Id.* at 2. According to Bashir's version of the facts, GDC was in dire straits following chronic financial mismanagement by the Saudi Arabian Monarchy and high-level government officials. *See id.* at 18–23 (chronicling GDC's ill-fated acquisition of Gore Design, egregious mismanagement, and insolvency). GDC was apparently so strapped for cash that it could not meet its payroll obligations or pay vendors. *Id.* at 23. In short, GDC was on the precipice of closing shop for good. *Id.* But that would have left the Saudi Government "holding the bag" on three of its own unfinished Boeing 787-8 aircraft—a major GDC project that the Saudi Government had already sunk hundreds of millions of dollars into. *Id.*; *see id.* at 21 (alleging that the Saudi Ministry of Finance "pumped over $150 million" into GDC to go towards completion of the planes, but GDC "was only negligibly closer" to completion due to "total mismanagement").

Bashir alleges that Boeing and Jerry Dunmire (Boeing's Director of Executive Transport Services and Support)[2] "knew all of this" and decided to "offer a temporary solution by awarding

---

[2] Dunmire was responsible for the VA-25A Program and "oversaw all head-of-state aircraft for Boeing, which included both domestic (Presidential Fleet) and international head-of-state aircraft." *Id.* at 24–25. Bashir's complaint indicates, however, that Dunmire "had no formal responsibility or involvement with the VC-25B Program." *Id.* at 35.

GDC another task order on the VC-25A Program and encouraging GDC to bid on the India Head of State Project . . . , as well as the VC-25B Program." *Id.* at 23.[3] Dunmire allegedly met with GDC's CEO and "told him what steps GDC had to take" to win a VC-25A refurbishment subcontract. Dkt. No. 61 at 25. In exchange for more "liquidity" to put towards the unfinished planes, "Boeing would be in a better position to secure a multi-billion [dollar] venture with the Saudi Government[.]" *Id.* at 23. The Saudi Government was aware of this scheme, too. It simply "looked the other way . . . so long as GDC did not require more money . . . and continued prioritizing the completion of the Saudis' [a]ircraft." *Id.* at 24.

Bashir is the CEO, owner, and founder of Emerald Aerospace, LLC, another subcontractor and GDC competitor specializing in high-end aircraft interiors. *Id.* at 5; Dkt. No. 77 at 11. He claims that he "became aware of numerous issues and irregularities" in Boeing's bidding process for the India Head of State Project and VC-25B Project. Dkt. No. 61 at 24. In late 2015 and early 2016, Dunmire met with Bashir and Emerald "numerous" times to discuss the prospect of Emerald performing subcontracting work for the VC-25A Program and India Head of State Program. *Id.* at 25–26. Boeing even began the process of formally approving Emerald as a potential subcontractor. *Id.* at 26. Things ultimately fell through for Emerald, though, as Boeing awarded the VC-25A subcontract to GDC despite Emerald's allegedly superior rates, qualifications, and technicians. *Id.* at 26–27.

In 2017 and 2018, Boeing "(through Dunmire)" directed "additional major subcontracts" to GDC, including the VC-25B Program subcontract. *Id.* at 27. Bashir claims that GDC's financial insolvency was all the while an "open secret," and that GDC would have failed the standard financial review and audit process performed on "every other bidder on the VC-25B Program." *Id.*

---

[3] The India Head of State Project refers to Boeing's contract with the Government of India to update two Boeing 777s. Dkt. No. 77 at 10.

For example, GDC never obtained a performance bond, and its credit was so poor that it could not even obtain the financing necessary to secure a performance bond. *Id.* at 28. To create sufficient "liquidity" to secure the VC-25B subcontract, Boeing supposedly encouraged GDC to falsely claim that it had two other contracts in the works. *Id.* at 29–30. Neither was a legitimate source of income for GDC. Both contracts involved Boeing, but one had been cancelled and another was simply never awarded to GDC. *See id.* at 30–31 (detailing false contracts).

Boeing awarded the VC-25B subcontract to GDC in April 2018. *Id.* at 28. Although Emerald never submitted a bid, Dkt. No. 77 at 10, Bashir complains that other applicants (and GDC competitors) were more qualified to receive the subcontract because they have "pristine reputation[s]," have over 30 years of experience designing high-end aircraft interiors, "were in compliance with the federal regulations and contractual requirements concerning foreign ownership status[ and] financial solvency," and possessed the "necessary security clearances to receive classified and top-secret information." Dkt. No. 61 at 29. GDC's inexperience and insolvency soon caught up with the alleged conspirators in the form of "massive performance problems." *Id.* at 43; *see also id.* at 42–45 (cataloguing deficiencies and delays). Boeing, however, did not report this to the Government. It instead purportedly certified GDC's compliance with all contractual and regulatory requirements "for the next several years" so that it could continue to collect Government payments under the VC-25B prime contract and "curry favor with" Saudi Arabia. *Id.* at 33–34; *see also id.* at 46 ("Boeing falsely represented and certified to the U.S. Government that its major subcontractor for Air Force One complied with numerous material Federal Acquisition Regulations . . . [and] continued making and accepting progress payments[.]").

Meanwhile, Boeing management informed Emerald that its bid on the India Head of State Project was "best technical, best price, and lowest execution risk," and met with Emerald's management team to "confirm[] that Emerald had won" the project. *Id.* at 35. This proved to be a

short-lived victory for Emerald. Bashir thereafter "receiv[ed] reports" that Dunmire and other "higher-level executives at Boeing" were actively lobbying to award the subcontract to GDC. *Id.* at 35–36. Emerald's fears were confirmed when, several days later, Boeing awarded the India Head of State subcontract to GDC. *Id.* at 36; *see also* Dkt. No. 77 at 10.

Emerald and Bashir were incensed. In response, they filed a confidential ethics complaint with Boeing "detailing the disturbing irregularities and fraudulent conduct [that Bashir] personally witnessed and . . . was reported to him by other Boeing employees and competitors[.]" Dkt. No. 61 at 36; *see also id.* at 36–37 (summarizing issues raised in ethics complaint). However, instead of using this information to "impartially investigate" the allegations, Boeing took steps to "mitigate the impact and negative fallout[.]" *Id.* at 37. Bashir further claims that he partook in several calls with Boeing's in-house counsel, who "grill[ed]" and "cross-examin[ed]" him on his sources, asked whether he had shared any of the information with the Government, and instructed him "not to discuss this with anyone else within Boeing[.]" *Id.* at 38. Boeing then went "radio silent" and never followed up with Bashir on the results of its investigation. *Id.*

In early 2019, GDC completed work on the Saudi Government's Boeing 787-8 aircraft. *Id.* at 39. The Saudi Ministry of Finance thereafter "abandoned and forfeited all ownership interest and affiliation with GDC[.]" *Id.* at 40. MAZ Aviation Consulting, a company owned primarily by Defendant Mohammad Hamad A. Al Zeer (a citizen of Saudi Arabia), subsequently acquired 100% ownership of GDC. *Id.* at 6, 40. Bashir contends that Al Zeer and "other Saudi insiders" drained GDC's remaining capital and "enriched themselves" with funds "paid by the U.S. taxpayers in connection with the Air Force One Subcontracts." *Id.* at 40–41; *see also id.* at 3 n.4.[4]

---

[4] The Court ordered Bashir to show cause why it should not dismiss Al Zeer without prejudice for failure to timely serve him under Rule 4. Dkt. No. 87 at 2–3. Bashir filed a response asking the Court to extend Rule 4(m)'s 90-day service window because he has been unable to locate and serve Al Zeer, who he believes is purposefully avoiding service in Saudi Arabia. *See generally* Dkt. No. 88. Bashir has also moved for substituted service under Rule 4(f)(3).

1    Bashir initiated this qui tam suit in April 2019. Dkt. No. 1. He alleged that Boeing, GDC,

2    Dunmire, and Al Zeer (Count 1) knowingly caused to be presented false or fraudulent claims for

3    payment, 31 U.S.C. § 3729(a)(1)(A); (Count 2) knowingly caused to be made or used a false record

4    material to a false or fraudulent claim, *id.* § 3729(a)(1)(B); (Count 3) knowingly conspired to

5    present false or fraudulent claims, *id.* § 3729(a)(1)(C); (Count 4) violated the Anti-Kickback

6    Statute, 42 U.S.C. § 1320a-7b(b); and (Count 5) retaliated against him for pursuing an FCA qui

7    tam action, 31 U.S.C. § 3730(h). Dkt. No. 1 at 14–19.[5] Following several extensions of the

8    intervention window, the Government declined to proceed with the action in January 2021. Dkt.

9    Nos. 5–6, 11–12, 18, 20, 22–25; *see* 31 U.S.C. § 3730(b)(2), (b)(3), (b)(4)(B).

10   By April 2021, mounting insolvency driven delays forced Boeing to cancel its subcontracts

11   with GDC and sue the company in Texas state court for breach of contract. Dkt. No. 61 at 46–47.

12   GDC initiated Chapter 11 bankruptcy proceedings that same month in the Western District of

13   Texas. *Id.* at 47. Bashir filed a proof of claim in those proceedings summarizing the same factual

14   and legal allegations raised in his qui tam complaint. *Id.*; Dkt. No. 77 at 12. In June 2022, the

15   bankruptcy court disallowed Bashir's proof of claim in part because he failed to sufficiently plead

16   an FCA violation. Dkt. No. 77 at 12, 34–61. As particularly relevant here, the court did not discern

17   "a single request or demand for money or property" in Bashir's complaint. *Id.* at 58. Nor did it find

18   sufficient Bashir's "broad[] alleg[ations] that a Boeing executive pushed subordinates to award

19   GDC a handful of subcontracts for which GDC was allegedly unqualified." *Id.* at 58–59 ("The

20

21   Dkt. No. 90. The Court denies the motion without prejudice given its ruling on Defendants' motion to dismiss. Bashir
     may refile the motion with respect to his second amended complaint, should he choose to file one. The Court, however,

22   expresses skepticism as to any claim against Al Zeer based on the allegations in Bashir's operative complaint. Al
     Zeer's role in this case appears to be limited to his conduct as a representative and majority owner of GDC—which

23   has now been dismissed from this action. Put differently, Bashir's allegations do not plausibly establish that Al Zeer
     in his individual capacity submitted a false claim for payment, knowingly conspired to present a false claim for
     payment, or knowingly retained overpayments in violation of the FCA.

24   [5] Bashir alleged Count 5 against only Boeing and Dunmire. *Id.* at 18.

Complaint describes why Bashir thinks GDC was the wrong choice for the award, not any sort of scheme between Boeing and GDC to fraudulently claim money from the government.").[6]

Before striking out in the bankruptcy proceedings, Bashir filed and served on the Government his first amended qui tam complaint—the operative pleading in this action. Dkt Nos. 61, 64. He now claims that (Count 1) Boeing knowingly caused to be presented false or fraudulent claims for payment and knowingly caused to be used a false record material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(A)–(B);[7] (Count 2) Defendants knowingly conspired to present false or fraudulent claims, 31 U.S.C. § 3729(a)(1)(C); (Count 3) Boeing knowingly retained overpayments, *id.* § 3729(a)(1)(G); (Count 4) Defendants violated the Anti-Kickback Act, 41 U.S.C. § 8702;[8] and (Count 5) Defendants were unjustly enriched by their false claims. Dkt. No. 61 at 53–61. The Government again declined to intervene. Dkt. Nos. 69–70, 73. And, as noted above, Bashir has since voluntarily dismissed GDC. Dkt. Nos. 82–84.

Boeing and Dunmire moved to dismiss the amended complaint. Dkt. No. 77.

## II.   DISCUSSION

The Court begins with the governing standard before addressing Bashir's motion to strike. It then discusses whether Bashir's claims survive dismissal. As explained below, they do not.

### A.   Legal Standard – Rules 8(a) and 9(b)

Dismissal under Rule 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). At this stage, the Court accepts as true

---

[6] Bashir appealed the bankruptcy court's decision but then settled with GDC. Dkt. No. 81 at 6 n.1.

[7] Bashir's amended complaint combines his (a)(1)(A) and (a)(1)(B) claims under one count. Dkt. No. 61 at 53–54.

[8] As Defendants observe, Bashir's original complaint mistakenly cited to the Anti-Kickback *Statute* (as opposed to the Act), which imposes criminal penalties for misconduct involving federal health care programs. *See* Dkt. No. 77 at 11 & n.5.

1   all well-pleaded factual allegations in the complaint and construes them in the light most favorable

2   to the relator-plaintiff. *United States v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011). "To

3   survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

4   to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

5   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Fed. R. Civ. P. 8(a)(2) (a

6   plaintiff must make a "short and plain statement of the claim showing that the pleader is entitled

7   to relief"). A claim is facially plausible "when the plaintiff pleads factual content that allows the

8   court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

9   *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it

10  asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*,

11  550 U.S. at 556).

12          The standard is more demanding when a party alleges fraud or mistake. In that case, the

13  party must "state with particularly the circumstances constituting fraud or mistake," although

14  "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

15  Fed. R. Civ. P. 9(b). Qui tam actions under the FCA involve allegations of fraud, meaning they

16  must meet both Rule 8(a)'s plausibility requirements and Rule 9(b)'s more demanding particularity

17  requirement. *Corinthian Colls.*, 655 F.3d at 992. Conclusory allegations of fraud are therefore

18  insufficient, *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001), as are "[b]road

19  allegations that include no particularized supporting detail," *United States v. United Healthcare*

20  *Ins. Co.* ("*Swoben*"), 848 F.3d 1161, 1180 (9th Cir. 2016). To satisfy Rule 9(b), a relator-plaintiff

21  must "identify the who, what, when, where, and how of the misconduct charged, as well as what

22  is false or misleading about the purportedly fraudulent statement, and why it is false." *United States*

23  *ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (cleaned up); *see also*

24  *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) ("The complaint must specify such facts as

the times, dates, places, benefits received, and other details of the alleged fraudulent activity.").

Rule 9(b)'s heightened pleading standard serves two purposes. First, the rule ensures that allegations are "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee*, 236 F.3d at 1019 (cleaned up). The Ninth Circuit has accordingly suggested that the "most basic consideration" in judging a complaint under Rule 9 "is the determination of how much detail is necessary to give adequate notice" to the defendant "and enable that party to prepare a responsive pleading." *Swoben*, 848 F.3d at 1180 (internal quotation marks omitted) (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (3d ed. 2016)). Second, the rule serves "to deter the filing of complaints as a pretext for the discovery of unknown wrongs," shield defendants "from the harm that comes from being subject to fraud charges," and "prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Bly-Magee*, 236 F.3d at 1018 (cleaned up).

## B.    Bashir's Motion to Strike

Defendants attach to their motion to dismiss (1) the July 2022 bankruptcy court order from GDC's Chapter 11 proceedings disallowing Bashir's proof of claim and (2) a February 2016 USA Today news article about GDC's "Saudi ties" and involvement with Air Force One. Dkt. No. 77 at 34–64. Bashir moves to strike these materials as improper at the dismissal stage because his complaint does not attach or otherwise reference them. Dkt. No. 81 at 10. He also urges the Court not to take judicial notice of those materials. *Id.*; *see United States v. Ritchie*, 342 F.3d 903, 907–908 (9th Cir. 2003) (a district court ordinarily may not consider evidence beyond the complaint unless it converts the motion into one for summary judgment; however, it may consider documents attached to the complaint, documents incorporated by reference in the complaint, and matters of

1   judicial notice).

2          Bashir advances several reasons why he believes judicial notice of the attached materials

3   is inappropriate. He first contends that the bankruptcy court's order is "a red herring of no

4   probative value" because the court did not consider the allegations in his amended complaint, he

5   appealed the order, and GDC has now settled with him. Dkt. No. 81 at 11. As for the USA Today

6   article, Defendants rely on it as evidence that the allegations in Bashir's amended complaint were

7   public knowledge prior to this lawsuit. *Id.*; *see* Dkt. No. 77 at 10 & n.3, 29–30 & n.28; Dkt. No.

8   85 at 15–16. Bashir suggests that the Court need not consider the article because, contrary to

9   Boeing's representations, the article did not publicize the information his amended complaint now

10  brings to light. Dkt. No. 81 at 11. These arguments misconstrue the judicial notice inquiry.

11         Under Federal Rule of Evidence 201(b), a district court may judicially notice a fact "that

12  is not subject to reasonable dispute[.]" Facts are indisputable, and thus subject to judicial notice,

13  only if they are "generally known within the trial court's territorial jurisdiction" or "can be

14  accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

15  Fed. R. Evid. 201(b)(1)–(2); *see Ritchie*, 342 F.3d at 909. District courts routinely take judicial

16  notice of public records, court filings and orders, and dockets in other cases. *See Reyn's Pasta*

17  *Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice

18  of court filings and other matters of public record."); *Khazali v. Berns*, No. C16-1022-JLR, 2016

19  WL 4479915, at *1 n.3 (W.D. Wash. Aug. 24, 2016) (collecting cases). With these principles in

20  mind, the Court takes judicial notice of the July 2022 bankruptcy court order and considers it as

21  an indication of what information was in the public realm at the time Bashir filed his first amended

22  complaint.

23         With respect to the USA Today news article, the Court first notes that "news media" is one

24  of the designated channels for public disclosure under the FCA. 31 U.S.C. § 3730(e)(4)(A)(iii).

Consistent with the purpose of Section 3730(e)(4)(A), Boeing offers the news article "not for the truth of the information contained within [it], but merely to show that the information was publicly available." *United States ex rel. Hong v. Newport Sensors, Inc*, 728 F. App'x 660, 661 (9th Cir. 2018) (cleaned up). Bashir does not dispute the authenticity of the article, nor does he dispute Boeing's assertion that it was publicly available three years before he filed his original complaint. *See* Dkt. No. 77 at 29–30; Dkt. No. 81 at 10–11, 26–28. Accordingly, the fact of the article's public availability is not disputed by the parties, nor is it subject to reasonable dispute. *Hong*, 728 F. App'x at 661. The Court therefore considers the article "solely as an indication of what information was in the public realm at the time." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

The Court declines to strike the two exhibits attached to Defendants' motion to dismiss.

**C.    The FCA's Public Disclosure Bar**

A district court "shall dismiss" an FCA qui tam action "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in any of following three channels: (i) "in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party"; (ii) "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or (iii) "from the news media[.]" 31 U.S.C. § 3730(e)(4)(A). This rule, known as the public disclosure bar, has "a generally broad scope" and is "wide-reaching." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408 (2011). Congress wished "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 295 (2010); *see also United States v. Allergan, Inc.*, 46 F.4th 991, 994 (9th Cir. 2022) ("Stated another way, the public disclosure bar prevents a relator from merely repackaging information enumerated in the public disclosure bar for personal profit by asserting

an FCA claim.").

The public disclosure bar is triggered when three elements are met: "(1) the disclosure at issue occurred through one of the channels specified in the statute; (2) the disclosure was public; and (3) the relator's action is substantially the same as the allegation or transaction publicly disclosed." *Allergan*, 46 F.4th at 996 (cleaned up). Defendants argue that all three elements of the public disclosure bar are met here. Dkt. No. 77 at 29. They claim that Bashir's amended complaint "contains substantially the same allegations as were publicly disclosed in GDC's bankruptcy proceedings," and the Court "need look only at the citations in the [a]mended [c]omplaint." *Id.*[9] According to Defendants, Bashir "looked for federal laws and regulations that might apply to federal contracting, and then mined the bankruptcy documents for facts to allege in support of violations of those laws and regulations." Dkt. No. 77 at 30. Bashir's allegations about GDC's Saudi ownership fare no better in their view. Defendants characterize those as "particularly stale and derivative" in light of the February 2016 USA Today article, which "reported that GDC was Saudi-owned and that the Pentagon confirmed its foreign ownership." *Id.* at 29–30.

Application of the public disclosure bar turns on the third element in this case—whether Bashir's amended complaint "is substantially the same as the allegation[s] or transaction[s] publicly disclosed" in either the 2016 USA Today article or the April 2021 bankruptcy proceedings. *Allergan*, 46 F.4th at 996. "Transactions or allegations are disclosed if they can be found in pleadings or other public filings." *Amphastar Pharms. Inc. v. Aventis Pharma SA*, 856 F.3d 696, 703 (9th Cir. 2017). In the Ninth Circuit, the term "allegations" refers to "direct claims of fraud," while "transaction" refers to "facts from which fraud can be inferred." *Id.* (internal

---

[9] Defendants suggest that GDC's bankruptcy proceedings qualify as a subsection (i) disclosure channel, i.e., "a Federal hearing in which the Government is a party[.]" 31 U.S.C. § 3730(e)(4)(A)(i). Although Bashir does not appear to dispute this, *see* Dkt. No. 81 at 26–28, the record is unclear as to whether the Government was in fact "a party" to GDC's bankruptcy proceedings. However, the Court need not solve this mystery for the reasons discussed below.

quotation marks omitted) (quoting *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 571 (9th Cir. 2016)). "[W]hen a critical mass of the underlying facts or of the allegations in the *qui tam* complaint have been disclosed prior to the *qui tam* complaint being filed, the public disclosure bar applies." *Id.*; *see also Mateski*, 816 F.3d at 578–80 (qui tam complaints are not to be read at a high level of generality; the test is not whether the action is "partly based upon" facts already in the public domain, or whether there was enough publicly disclosed information for the Government to pursue an investigation).

The Court begins with the 2016 USA Today article. As relevant here, this two-page exposé indicates that (1) GDC was servicing Air Force One; (2) the Pentagon (for the first time) acknowledged that a foreign contractor had worked on Air Force One; and (3) MAZ Aviation, which is owned by Al Zeer, purchased GDC in 2013. Dkt. No. 77 at 63. The article otherwise discusses in broad terms the Air Force's security protocols and notes that neither GDC nor any foreign national had unsupervised access to Air Force One. *Id.* Finally, the article mentions the "issue" with foreign ownership of facilities relied on by the U.S. Government, as well as a 2007 law "passed in the wake of the Dubai Ports World controversy" that requires the Committee on Foreign Investments to review any foreign acquisition of a domestic company. *Id.* at 63–64.

The amended complaint runs deeper than merely exposing GDC's Saudi ties and ownership. As Bashir puts it, the article "says nothing about . . . the true scale of the VC-25B Subcontracts and the national security concerns implicated" by Boeing's alleged statutory, regulatory, and contractual violations. Dkt. No. 81 at 28. The article does not, for example, disclose that "top-secret information concerning the design and specifications of the new Air Force One aircraft w[ere] being unlawfully released to a foreign government and foreign individuals." *Id.* at 27. The Court therefore cannot say that the article contains "a critical mass" of the underlying facts or allegations in Bashir's amended complaint.

The opposite may be true with respect to GDC's bankruptcy proceedings. The Court agrees with Defendants that Bashir's amended complaint is at points saturated with footnote citations to pleadings and other documents from either (1) the April 2021 Texas state court litigation between Boeing and GDC or (2) GDC's April 2021 bankruptcy proceedings. *See* Dkt. No. 61 at 12, 20–23, 27, 40–42, 44–51 & n.19, 29, 31–33, 37–40, 42–45, 56–69, 71–86, 88–97, 99. The Court, however, need not determine whether this amounts to a "critical mass" of the underlying facts.

Defendants overlook a critical exception to the public disclosure bar: when the relator-plaintiff "is an original source of the information." 31 U.S.C. § 3730(e)(4)(A); *see Amphastar*, 856 F.3d at 705 (even if the public disclosure bar is triggered, the second step in the analysis asks whether the relator is an "original source"). An "original source" is an individual who either (i) "prior to a public disclosure under subsection (e)(4)([A]), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based"; or (ii) "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an [FCA] action[.]" 31 U.S.C. § 3730(e)(4)(B).

Bashir claims that he falls into the first category of an "original source" relator-plaintiff because he "voluntarily brought the material allegations within the [a]mended [c]omplaint to the Government's attention beginning in April 2018—well before the initiation of GDC's bankruptcy proceedings." Dkt. No. 81 at 28; *see* Dkt. No. 61 at 5 ("[Bashir] voluntarily brought these material allegations to the attention of the U.S. Government beginning in April 2018—prior to any public disclosure.").[10] According to him, the bankruptcy proceedings "merely proved [that] what [he]

---

[10] Bashir appears to place himself in the second relator-plaintiff "original source" category as well. However, he alleges only that he "had knowledge of and materially added to the allegations underlying the false claims" at issue. Dkt. No. 61 at 5. Even assuming this conclusory allegation is sufficient, Bashir fails to specify whether his knowledge is also "independent of" the publicly disclosed allegations or transactions as required by the statute. *See* 31 U.S.C. §

brought to the attention of the Government in 2018 was true," and the "disclosure and development of these facts" during the bankruptcy proceedings "does not invoke the public disclosure bar." Dkt. No. 81 at 28. Defendants do not contest the original source allegations in Bashir's amended complaint. Dkt. No. 77 at 29–30; Dkt. No. 85 at 15–16. Accepting these allegations as true and construing them in the light most favorable to Bashir, the Court concludes that the public disclosure bar does not require their dismissal. *See United States ex rel. Savage v. CH2M Hill Plateau Remediation Co.*, No. 4:14-CV-5002-EFS, 2015 WL 5794357, at *10–11 (E.D. Wash. Oct. 1, 2015) (finding similar allegations sufficient).

**D.      Count 1: Section 3729(a)(1)(A) and (a)(1)(B) (Against Boeing)**

The FCA makes liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(A)–(B). A "claim" under the statute "includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 182 (2016) ("*Escobar*"); *see* 31 U.S.C. § 3729(b)(2)(A). The archetypal qui tam FCA action involves a private company overcharging under a government contract—a situation in which the claim for payment "is itself literally false or fraudulent." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006). However, a claim under the FCA can also be false "where a party merely falsely certifies compliance with a statute or regulation as a condition [of] government payment." *Id.* at 1171. A false certification claim requires the relator-plaintiff to show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing

---

3730(e)(4)(B).

1    (4) the government to pay out money or forfeit moneys due." *Id.* at 1174; *accord Swoben*, 848

2    F.3d at 1173.

3         Defendants challenge the first (falsity) and third (materiality) elements. *See* Dkt. No. 77 at

4    15, 24.

5         1.   <u>Falsity</u>

6         "There are two cognizable theories of liability for legally false claims: express false

7    certification and implied false certification." *Silingo*, 904 F.3d at 675. Express false certification

8    occurs when "the entity seeking payment certifies compliance with a law, rule or regulation as part

9    of the process through which the claim for payment is submitted." *Ebeid ex rel. United States v.*

10   *Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). In contrast, "[i]mplied false certification occurs when

11   an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that

12   obligation is implicated by submitting a claim for payment even though a certification of

13   compliance is not required in the process of submitting the claim." *Id.* Under this theory, an entity

14   impliedly certifies compliance with all conditions of payment when it submits a claim. *Escobar*,

15   579 U.S. at 180. And if the entity "fails to disclose [its] violation of a material statutory, regulatory,

16   or contractual requirement, . . . the [entity] has made a misrepresentation that renders the claim

17   'false or fraudulent' under § 3729(a)(1)(A)." *Id.*

18        Bashir raises both theories. Dkt. No. 61 at 54 n.103; Dkt. No. 81 at 13 ("Both theories are

19   plausibly manifested in [Bashir]'s Amended Complaint."). He claims that Boeing's prime

20   contracts with the Air Force obligated Boeing and its subcontractors "to represent and certify . . .

21   full compliance with all contract provisions and mandatory federal statutes and regulations," and

22   that Boeing nonetheless "knowingly and deliberately made false representations and certifications

23   to the U.S. Government in connection with claims for payment on the VC-25A and VC-25B

24   Programs." Dkt. No. 61 at 54–55. According to Bashir, Boeing "knew, but failed to disclose to the

U.S. Government" several contractual, statutory, and regulatory violations when it "fraudulently awarded" GDC the VC-25A and VC-25B subcontracts, "as well as each time Boeing sought and received milestone payments" under its prime contracts. *Id.* at 54; *see also, e.g.*, *id.* at 50 ("Each time Boeing requested or received a progress payment from the U.S. Government in connection with the \$3.9 billion VC-25B Program it did so knowing that material federal statutes, regulations, and contractual requirements under the prime contract were being violated.").[11]

The amended complaint alleges that Boeing and GDC violated and then falsely certified compliance with the following statutes, regulations, and contractual provisions:

- "The source selection process was not the result of open, fair, full, and impartial competition, in violation of Boeing's prime contract with the U.S. Government and 10 U.S.C. § 2304";

- "GDC was owned, influenced, and controlled by the Saudi Government, in violation of Boeing's prime contract with the U.S. Government; 10 U.S.C. § 2536; 48 C.F.R. §§ 252.209-7001 and 7002; 32 C.F.R. Part 117 (NIPSOM)";

- "GDC was financially insolvent, incapable of performing, had made numerous material false representations in connection with source selection, and did not comply with 48 C.F.R. §§ 9.103, 9[.]104-4; 48 C.F.R. § 52.203-13";

- "GDC did not and could not obtain the performance bond required by Boeing's prime contract with the U.S. Government and 48 C.F.R. § 28.102-2";

- "GDC did not and could not comply with the mandatory requirements for a DX-A1 Rated Order, in violation of Boeing['] prime contracts with the U.S. Government, as well as the DPAS requirements, and 15 C.F.R. Part 700";

- "GDC was in violation of the security requirement for safeguarding classified and top-secret information, in violation of Boeing's prime contract with the U.S. Government, as well as 48 C.F.R. § 52.204-2; 32 C.F.R. Part 117; ITAR and Trade Control laws, and 22 C.F.R. Part 120 to 130";

- "GDC was prioritizing the completing of the Saudis' 787-8 Aircraft and 777ER

---

[11] Bashir further asserts that "[t]hese representations and certifications were required to be made *at the time of acceptance*[.]" *Id.* at 54 (emphasis added). This allegation appears to hint at promissory fraud. Under that theory, "liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct." *Hendow*, 461 F.3d at 1173. However, Bashir's amended complaint does not separately enumerate a promissory fraud claim or otherwise develop the theory beyond this passing reference.

Aircraft and using funds received under the Air Force One Subcontracts to complete the Saudis' 787-8 and 777ER Aircraft"; and

- "Defendants' conduct constituted violations of the Anti-Kickback Statutes [sic] under 41 U.S.C. § 8702, 48 C.F.R. § 3.502-2 and 48 C.F.R. § 52.203-7[.]"

*Id.* at 54–55; *see also id.* at 11–18 (discussing statutes and regulations that Boeing and GDC allegedly violated and falsely certified compliance with).

The Court addresses the sufficiency of Bashir's falsity allegations under the express and implied certification theories.

### *(a) Express False Certification*

Defendants argue that Bashir fails to "identify a single overtly false representation in any claim for payment Boeing submitted to the government." Dkt. No. 77 at 15; *see Ebeid*, 616 F.3d at 998 (express certification occurs when the entity seeking payment "certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted"). The Court agrees.

Bashir points to just one allegation (located in footnote 87 of the amended complaint) in support of his express certification claim. Dkt. No. 81 at 13. This allegation is unavailing. It avers that "many progress payments were predicated on accomplished engineering drawings" and, "[u]pon information and belief, Boeing and GDC falsely certified compliance and completion of these drawings in order to receive payments from the United States Government." Dkt. No. 61 at 46 n.87. Bashir argues that Boeing's certification of completed work "that it knows was not actually done in accordance with the prime contract constitutes an adequately pled express false certification claim." Dkt. No. 81 at 13. But as Defendants point out, this allegation merely underscores Bashir's failure to meet Rule 9(b)'s particularity standard.

"Claims made on information and belief are not usually sufficiently particular [to survive Rule 9(b)], unless they accompany a statement of facts on which the belief is founded." *Shroyer*,

622 F.3d at 1042 (although claims were asserted on information and belief, plaintiff "explain[ed] exactly what it [was] that he believe[d] constituted the fraudulent statements"); *Milken*, 6 F.3d at 672 (a plaintiff who makes allegations on information and belief must still "state the factual basis for that belief."). Here, Bashir fails to support his express certification allegation with a sufficient factual basis. A two-sentence footnote is not enough. Indeed, it is not even clear from the complaint whether Boeing "plainly and directly certif[ied] its compliance" with the engineering drawings. *United States v. Aerojet Rocketdyne Holdings, Inc.*, 381 F. Supp. 3d 1240, 1245 (E.D. Cal. 2019); *see also Bly-Magee*, 236 F.3d at 1019 (fraud allegations must be specific enough to give the defendant notice of the particular misconduct which is alleged to constitute the fraud charged so that it can defend against the charge rather than deny any wrongdoing generally).

### (b) Implied False Certification

Defendants next contend that Bashir's implied false certification claims fail because "he does not describe *any* specific representations Boeing made in its claims for payment." Dkt. No. 77 at 16 (emphasis original). Bashir disagrees. He counters that the amended complaint "thoroughly and methodically sets forth the specific contractual and regulatory obligations that Boeing is required to certify compliance with under the prime contract, states specifically how Boeing was knowingly in violation of those regulations, and connects those violations with the false certifications for progress payments under the VC-25B Program." Dkt. No. 81 at 14–15 (footnotes omitted). Bashir observes (correctly, too) that he is "not required to state specific milestone payment amounts or dates," and that he has "sufficiently alleged the 'who, what, when, where, and how' of Boeing's fraud on the government by alleging a 'laundry list' of violated federal regulations despite [its] certification of compliance[.]" *Id.* at 17. Boeing therefore cannot, he argues, "reasonably contend that [his] allegations somehow leave [it] in the dark as to where to look or what to defend." *Id.*

The Court agrees with Bashir. The amended complaint could certainly benefit from additional details on or references to specific progress payments; however, and as Bashir notes, that is not the test. He was not required to identify specific invoices or progress payments, or support his allegations with representative examples. *See Ebeid*, 616 F.3d at 998–99; *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001). It is enough to "allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998–99 (cleaned up). Bashir has done that here. The who (Boeing), what (VC-25A and VC-25B prime contracts), when/where (every progress payment), and how (false certification of compliance with statutory, regulatory, and contractual requirements) are adequately discernable in the amended complaint such that Boeing has sufficient notice of the alleged fraud and enough information to prepare a responsive pleading. *Swoben*, 848 F.3d at 1180; *see, e.g.*, *UPPI LLC v. Cardinal Health, Inc.*, No. 21-35905, 2022 WL 3594081, at *2 (9th Cir. Aug. 23, 2022) (the who, what, where, when, and how were adequately discernable such that Rule 9(b)'s dual purpose was fulfilled); *Savage*, 2015 WL 5794357, at *12 (complaint contained sufficient particularity to place defendants on notice of the alleged fraud and their involvement in the scheme where it "identifie[d] the business entities, the pertinent prime contract on which implied false certifications were based, the subcontracts on which express and implied false certifications were based, and the fraudulent scheme by which [the defendants] created small, disadvantaged business facades.").

Defendants nonetheless accuse Bashir of overlooking the Supreme Court's decision in *Escobar* and applying the incorrect standard for implied false certification claims. Dkt. No. 85 at 8. Under the Ninth Circuit's pre-*Escobar* cases, "a relator bringing an implied certification claim could show falsity by pointing to noncompliance with a law, rule, or regulation that is necessarily implicated in a defendant's claim for payment." *United States ex rel. Rose v. Stephens Inst.*, 909

F.3d 1012, 1017–18 (9th Cir. 2018); *see Ebeid*, 616 F.3d at 998. That is no longer so. Following *Escobar*, two additional conditions must be met: first, the claim must "not merely request payment, but also make[] specific representations about the goods or services provided"; and second, "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements [must] make[] those representations misleading half-truths." *Escobar*, 579 U.S. at 190; *see Rose*, 909 F.3d at 1018.

Because Bashir "has not and cannot identify any . . . specific representations made by Boeing in connection with submitting false claims for payment," Defendants argue that his implied false certification claims must fail. Dkt. No. 85 at 8. The Court again disagrees. Bashir has sufficiently detailed the alleged statutory, regulatory, and contractual requirements that Boeing specifically (although impliedly) represented compliance with "[e]ach time [it] requested or received a progress payment from the U.S. Government in connection with the . . . VC-25B Program[.]" Dkt. No. 61 at 50. And Boeing and GDC's noncompliance with those requirements rendered Boeing's contrary representations misleading half-truths. Thus, setting aside materiality, Bashir's allegations pass muster under *Escobar*'s two falsity conditions. *See, e.g.*, *UPPI*, 2022 WL 3594081, at *3; *United States ex rel. Mei Ling v. City of Los Angeles*, No. CV-11-974-PSG (JCx), 2018 WL 3814498, at *6–7 (C.D. Cal. July 25, 2018).[12]

2. Materiality

Bashir's false certification claim goes no further, though, because he fails to sufficiently allege materiality for any of the underlying statutory, regulatory, or contractual violations.

A misrepresentation about compliance with a statutory, regulatory, or contractual

---

[12] Defendants also contend that none of the referenced statutes or regulations can form the basis of a false certification claim for one of two reasons: (1) they "impose no requirements on Boeing" or (2) Bashir fails to adequately allege that they were violated. Dkt. No. 77 at 17–24. Indeed, some of the regulations appear to have been repealed before the alleged misconduct in this case occurred, or otherwise do not apply to Boeing. *See id.* at 17–20. The Court, however, declines to address these arguments given Bashir's failure to sufficiently allege materiality (discussed below).

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 22

requirement must be material to the Government's payment decision to give rise to liability under the FCA. *Escobar*, 579 U.S. at 192. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). This standard is "demanding." *Escobar*, 579 U.S. at 194. And federal courts will enforce it "rigorously" to shield government contractors from "onerous and unforeseen FCA liability as the result of noncompliance with any of potentially hundreds of legal requirements established by contract." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010) (internal quotation marks omitted).

A misrepresentation is not per se material "merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment," or because the Government retains the option to decline payment if it knows of the defendant's noncompliance. *Escobar*, 579 U.S. at 194. The Government's decision to expressly identify a provision as a condition of payment is relevant to (but not dispositive of) the materiality inquiry, as is evidence that the Government "consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* at 194–95. If, on the other hand, the Government "pays a particular claim in full despite its actual knowledge that certain requirements were violated" or "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated," that is strong evidence that neither the underlying requirement nor the misrepresentation is material. *Id.* at 195. Minor or insubstantial noncompliance cannot be material. *Id.* at 194.

A relator-plaintiff must therefore plausibly allege that the statutory, regulatory, or contractual requirements are "so central" to the claims that the Government "would not have paid these claims had it known of the violations." *Id.* at 196; *see Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1121 (9th Cir. 2020). The Ninth Circuit has

interpreted *Escobar* as a "gloss" on the materiality analysis that requires district courts to evaluate three factors: (1) whether the Government's payment was conditioned on compliance with the statutory, regulatory, or contractual requirement at issue; (2) the Government's past enforcement of the requirement, i.e., how it has treated similar violations (this factor looks to the *Escobar* criteria); and (3) the magnitude of the violation. *See Rose*, 909 F.3d at 1020–22; *UPPI*, 2022 WL 3594081, at *3.

Bashir's allegations either overlook or only tangentially address these considerations. As Defendants note, his amended complaint is replete with conclusory assertions that the requirements at issue were material. *See* Dkt. No. 61 at 55–56 ("Each one of these false statements, representations, and omissions was material in the U.S. Government's decision to continue issuing progress payments to Boeing under the VC-25B and VC-25A Programs."); *see also, e.g.*, *id.* at 10, 33, 43, 46, 50. Although he spends some time discussing the statutes, regulations, and prime contract provisions, *see id.* at 11–18, he never explains why any of them are material to securing Government payment. The closest Bashir gets is his allegation that "[t]he Air Force One Subcontracts would have been immediately terminated had the U.S. Government been aware of any of the false claims and unlawful conduct alleged herein." *Id.* at 56.

Bashir's unadorned, conclusory allegation fails on a fundamental level. He must *plausibly* allege that the requirements at issue were "so central" to Boeing's claims for payment that the Government would not have issued progress payments on the VC-25A and VC-25B prime contracts had it known about the violations. Put differently, he must supply some supporting allegations to back up this assertion.

Bashir otherwise marshals several scattered allegations related to the President's safety while aboard an Air Force One aircraft, national security concerns, and the impact of delays on such a high-priority Government project. *See* Dkt. No. 81 at 22–23. These considerations are

1   relevant to the magnitude factor; however, they do not plausibly plead the remaining two

2   materiality considerations. *See Rose*, 909 F.3d at 1020–22; *UPPI*, 2022 WL 3594081, at *3–4.

3         Bashir's false certification claim therefore fails.

4         3.   <u>Section 3729(a)(1)(B) Claim</u>

5         Because Bashir's (a)(1)(A) claim fails, so does his (a)(1)(B) claim. *See United States ex*

6   *rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 335 (9th Cir. 2017) (a false or fraudulent claim is an essential

7   element of a use-of-false-statement claim).

8         The Court grants Defendants' motion to dismiss with respect to Count 1.

9   **E.**     **Count 2: Section 3729(a)(1)(C) (Against All Defendants)**

10         The FCA imposes liability on anyone who conspires to violate one of its provisions. 31

11   U.S.C. § 3729(a)(1)(C); *see Aerojet Rocketdyne*, 381 F. Supp. 3d at 1249. Bashir alleges that

12   Defendants "knowingly conspired to present false or fraudulent claims for payment to the United

13   States by failing to adhere to the regulations" identified in Count 1. Dkt. No. 61 at 57. However,

14   "an underlying violation of the other subparagraphs constituting a claim under the FCA is required

15   to state a claim for conspiracy to commit a violation of the FCA." *Lesnik v. Eisenmann SE*, 374 F.

16   Supp. 3d 923, 940 (N.D. Cal. 2019). Bashir does not dispute this. He instead maintains that he

17   adequately pleaded a false certification claim. Dkt. No. 81 at 23. As discussed above, that is not

18   the case.

19         Defendants' motion to dismiss is granted with respect to Count 2.

20   **F.**     **Count 3: Section 3729(a)(1)(G) (Against Boeing)**

21         Under the FCA's "reverse false claims" provision, liability attaches for anyone who

22   "knowingly makes, uses, or causes to be made or used, a false record or statement material to an

23   obligation to pay or transmit money or property to the Government," or who "knowingly conceals

24   or knowingly and improperly avoids or decreases an obligation to pay or transmit money or

property to the Government[.]" 31 U.S.C. § 3729(a)(1)(G); *see Silingo*, 904 F.3d at 676 (this subsection "is designed to cover Government money or property that is knowingly retained by a person even though they have no right to it." (cleaned up)). Bashir alleges that Boeing "presented numerous false claims for payment to the U.S. Government and knowingly retained the overpayments . . . when [it] failed to repay the money within 60 days." Dkt. No. 61 at 58. This claim is also foreclosed by Bashir's failure to adequately plead a false claim. *See Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011) ("The 'reverse false claims' provision does not eliminate or supplant the FCA's false claim requirement[.]"); *Kelly*, 846 F.3d at 336 (because relator's action for submitting false or fraudulent claims for payment failed, so too did his "reverse false claims" action).

Count 3 is dismissed, too.

## G.     Count 4: The Anti-Kickback Act (Against All Defendants)

The Anti-Kickback Act states that a person may not "provide, attempt to provide, or offer to provide a kickback[.]" 41 U.S.C. § 8702(1). Nor may a person "solicit, accept, or attempt to accept a kickback[.]" *Id.* § 8702(2). According to Bashir, "Boeing (through Dunmire) intentionally steered the VC-25B Subcontracts towards GDC even though Dunmire had no formal responsibility or involvement with the VC-25B Program." Dkt. No. 61 at 60 ("Upon information and belief, Boeing and Dunmire received kickbacks and other forms of *quid pro quo* in exchange for steering contracts to GDC."). The statute, however, provides that only the Government may bring a civil or criminal action to enforce violations. *See* 41 U.S.C. §§ 8706(a), 8707; *United States ex rel. Howard v. Caddell Constr. Co., Inc.*, No. 7:11-CV-270-FL, 2021 WL 1206584, at *33 (E.D.N.C. Mar. 30, 2021) ("The [Anti-Kickback Act] expressly provides a cause of action only for '[t]he Federal Government in a civil action,' and it does not provide its own basis like the False Claims Act for suit by a private plaintiff on behalf of the government." (alteration original)); *Bales v.*

1   *AECOM N&E Tech. Servs., LLC*, No. 4:18-CV-05156-SMJ, 2019 WL 13299349, at *1 (E.D.

2   Wash. June 6, 2019) (the Anti-Kickback Act does not provide a private right of action). Because

3   the Government declined to intervene, this claim must be dismissed.

4          The motion to dismiss is granted with respect to Count 4.

**H.     Count 5: Unjust Enrichment (Against All Defendants)**

6          Bashir last claims that "Defendants were unjustly enriched by engaging in unlawful acts

7   and knowingly and intentionally submitting false claims[.]" Dkt. No. 61 at 61. The FCA does not

8   grant a relator authority to assert equitable claims on the Government's behalf, *see United States*

9   *ex rel. Ebu-Isaac v. INSYS Therapeutics, Inc.*, No. 2:16-CV-07937-JLS-AJW, 2021 WL 3619958,

10  at *11–12 (C.D. Cal. June 9, 2021), and Bashir accordingly withdrew this claim after the

11  Government declined to intervene, *see* Dkt. No. 81 at 23 n.43.

12         The Court therefore dismisses Count 5.

**I.      Leave to Amend**

14         Bashir requests 30 days to file a second amended complaint. Dkt. No. 81 at 29. Defendants

15  resist amendment and urge the Court to dismiss Bashir's claims with prejudice because he "has

16  already had an opportunity to amend his complaint" and "[f]urther amendment would only

17  occasion additional delay." Dkt. No. 85 at 16.

18         Federal Rule of Civil Procedure 15(a)(2) directs district courts to "freely give leave when

19  justice so requires." As the language of the rule suggests, the standard for leave to amend is "very

20  liberal." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). This

21  is because "the underlying purpose of Rule 15 [is] to facilitate [a] decision on the merits, rather

22  than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

23  banc) (cleaned up). A district court should therefore deny leave to amend "only if there is strong

24  evidence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to

cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment[.]" *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (cleaned up).

There is no evidence of undue delay, bad faith, or dilatory motive here. And this is not a case in which Bashir has "repeatedly" failed to cure the deficiencies in his complaint. Defendants' motion to dismiss was the first pleading to attack the sufficiency of his allegations. *See Swoben*, 848 F.3d at 1182–83 (granting relator leave to file fourth amended complaint because motion to dismiss was first pleading to attack the sufficiency of his allegations). More importantly, however, Defendants do not articulate any prejudice. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam) (prejudice to the opposing party "carries the greatest weight" and, absent prejudice or a "strong showing" under the other factors, there is a presumption in favor of granting leave to amend).

This case is also in its infancy. The Court has not issued a scheduling order and the parties have not conducted any discovery. *See DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187–88 (9th Cir. 1987) (leave to amend did not prejudice opposing party because case was "still at the discovery stage with no trial date pending"); *United States ex rel. Reiber v. Basic Contracting Servs. Inc.*, No. 3:09-CV-05558-RBL, 2012 WL 3945803, at *2 (W.D. Wash. Sept. 10, 2012) (finding "little risk of prejudice" where discovery had not opened and relator had amended her complaint only once). And finally, the Court cannot say that Bashir will be unable to cure the deficiencies identified above. *See Bly-Magee*, 236 F.3d at 1019 ("We consistently have held that leave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegation of other facts." (cleaned up)).

Bashir may therefore file a second amended complaint.

### III.   CONCLUSION

The Court GRANTS Defendants' Motion to Dismiss. Dkt. No. 77. Bashir shall file under seal a second amended complaint within 30 days of the date of this Order. He must also serve a copy on the Government, which shall have 60 days from the date of service to intervene. Absent a timely motion to extend the intervention window, the Court will order the second amended complaint unsealed and direct Bashir to serve a copy on Defendants. *See* 31 U.S.C. § 3730(b)(2)–(b)(4). Bashir's Motion for Substituted Service is DENIED without prejudice. Dkt. No. 90.

In any future briefing, the Court expects full compliance with its Standing Order for all Civil Cases, including but not limited to the requirement that "[c]itations . . . must be included in the body of the briefing" and not in footnotes. *Compare* Dkt. No. 78 at 3–4, *and* Dkt. No. 86 at 5, *with* Dkt. No. 81, *and* Dkt. No. 90. The Court may impose sanctions for a party's failure to comply with its Standing Order in the future.

Dated this 29th day of September, 2023.

Lauren King
United States District Judge