1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA ex rel. AHMED BASHIR,

                        Plaintiff,

        v.

THE BOEING COMPANY; JERRY DUNMIRE; and MOHAMMAD HAMAD A. AL ZEER

                        Defendants.

C19-0600 TSZ

ORDER ON MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

THIS MATTER comes before the Court on Defendants The Boeing Company's and Jerry Dunmire's Motion to Dismiss the Second Amended Complaint, docket no. 104. Having reviewed all papers filed in support of, and in opposition to, the motion, the Court enters the following order.

This is a qui tam action under the False Claims Act ("FCA"). See 31 U.S.C. §§ 3729, 3730(b)(1). Relator-Plaintiff Ahmed Bashir alleges a conspiracy between Boeing and its subcontractor, GDC Technics, LLC, to defraud the United States Government in connection with two programs for constructing and maintaining the Air Force One fleet. He contends that Boeing made knowingly false representations and certifications to the Government about GDC's foreign ownership and financial

insolvency, GDC's acquisition of performance bonds and "technical and engineering experience," GDC's prioritization of projects involving Saudi aircraft above the Air Force One programs, and GDC's "misappropriation of U.S. Government funds" to complete "multiple aircraft" owned by the Saudi Government. Dkt. No. 96 at 2–3. According to Bashir, Boeing knew about these activities before it "unlawfully" awarded GDC the subcontract for the Air Force One Programs and each time it "illegally sought and obtained payment from the U.S. Government" for the Air Force One programs. Dkt. No. 96 at 3–4. Bashir claims that Boeing allegedly violated and then falsely certified its compliance with over 25 miscellaneous federal regulations. See id. at 11–23, 28–29, 31–33; see also Dkt. No. 104 at 18–25.

The Government thrice declined to intervene in this action. Dkt. Nos. 24, 73, 99; see 31 U.S.C. § 3730(b)(2), (b)(4)(B), (c)(3). Bashir voluntarily dismissed GDC from this lawsuit in December 2022. Dkt. Nos. 82–84. Defendants Boeing and Jerry Dunmire have now moved to dismiss Bashir's Second Amended Complaint with prejudice for failing to establish materiality and meet the plausibility and particularity standards set forth in Federal Rules of Civil Procedure 8(a) and 9(b). Dkt. No. 104 at 8–9. The Court grants the motion for the reasons discussed below and denies Bashir's request for leave to file yet another amended complaint.[1] See Dkt. No. 111 at 23–25.

---

[1] Because the Court can decide the matter based on the parties' filings, it denies Defendants' request for oral argument. See Dkt. No. 104 at 1.

ORDER ON MOTION TO DISMISS THE SECOND AMENDED COMPLAINT - 2

## I.  BACKGROUND

Boeing has prime contracts with the United States Air Force to perform maintenance and repair work on the Air Force One fleet: two Boeing 747-200 jetliners that are the "military version of the Boeing 747 airliner" and are "highly modified to serve as the flying National Command Center for the President of the United States." Dkt. No. 96 at 7. The Air Force has designated this fleet "VC-25A," and the parties and the Court refer to Boeing's associated maintenance contracts as the "VC-25A Program." Dkt. No. 96 at 7; Dkt. No. 104 at 5. Faced with mounting "capability gaps" and "rising maintenance costs," Congress authorized construction of two new Boeing 747s to replace the increasingly obsolescent VC-25A fleet. Dkt. No. 96 at 7. The "design, development, completion, and delivery" of the next generation of Air Force One is referred to as the "VC-25B Program." Id. at 8. The Air Force awarded Boeing the prime contract for the VC-25B Program. See Dkt. No. 96 at 2, 6–9. The contract is worth $3.9 billion. Id. at 8.

Boeing subcontracts with third parties, such as GDC, to design and install the interiors of the aircraft it manufactures. Id. at 8, 23. The Saudi Arabian Government owned and operated GDC for most of the period relevant to this lawsuit. Id. at 2. GDC was in dire straits following chronic financial mismanagement by the Saudi Arabian Monarchy and high-level government officials. See id. at 23–28, 44–45 (chronicling GDC's ill-fated acquisition of Gore Design, egregious mismanagement, and insolvency). GDC was apparently so strapped for cash that it could not meet its payroll obligations or pay vendors. Id. at 27. In short, GDC was on the precipice of closing shop. See id. at 26–28. But that would have left the Saudi Government "holding the bag" on three of its own

unfinished Boeing 787-8 aircraft—a major GDC project that the Saudi Government had already sunk hundreds of millions of dollars into. Id.; see id. at 26 (alleging that the Saudi Ministry of Finance "pumped over $150 million" into GDC to go towards completion of the planes, but GDC "was only negligibly closer" to completion due to "total mismanagement").

Bashir alleges that Boeing and Jerry Dunmire (Boeing's Director of Executive Transport Services and Support)[2] "knew all of this" and decided to "offer a temporary solution by awarding GDC another task order on the VC-25A Program and encouraging GDC to bid on the India Head of State Project[3] . . . as well as the VC-25B Program." Id. at 28. Dunmire allegedly met with the CEO of GDC and "told him what steps GDC had to take" to win a VC-25A refurbishment subcontract. Id. at 30. In exchange for more "liquidity" to put towards the unfinished planes, "Boeing would be in a better position to secure a multi-billion [dollar] venture with the Saudi Government[.]" Id. at 28. The Saudi Government was also aware of this scheme. Id. It simply "looked the other way . . . so long as GDC did not require more money . . . and continued prioritizing the completion of the Saudis' [a]ircraft." Id.

Bashir is the CEO, owner, and founder of Emerald Aerospace, LLC, another subcontractor and GDC competitor specializing in high-end aircraft interiors. Id. at 6. He claims that he "became aware of numerous issues and irregularities" in Boeing's bidding

---

[2] Dunmire was responsible for the VC-25A Program and "oversaw all head-of-state aircraft for Boeing, which included both domestic (Presidential Fleet) and international head-of-state aircraft." Dkt. No. 96 at 29. Bashir claims, however, that Dunmire "had no formal responsibility or involvement with the VC-25B Program." Id. at 64.

[3] The "India Head of State Project" refers to Boeing's contract with the Government of India to update two Boeing 777s. Id. at 30.

ORDER ON MOTION TO DISMISS THE SECOND AMENDED COMPLAINT - 4

process for the India Head of State Project and VC-25B Project. Dkt. No. 96 at 28–29. In late 2015 and early 2016, Dunmire met with Bashir and Emerald numerous times to discuss the prospect of Emerald performing subcontracting work for the VC-25A Program and India Head of State Program. Id. at 30–31. Boeing even began the process of formally approving Emerald as a potential subcontractor. Id. at 30. However, things ultimately fell through for Emerald, and Boeing awarded the VC-25A subcontract to GDC despite Emerald's allegedly superior rates, qualifications, and technicians. Id. at 31.

In 2017 and 2018, Boeing "(through Dunmire)" directed "additional major subcontracts" to GDC, including the VC-25B Program subcontract. Id. at 32. Bashir claims that GDC's financial insolvency was an "open secret", and that GDC would have failed the standard financial review and audit process performed on "every other bidder on the VC-25B Program." Id. For example, GDC never obtained a performance bond, and its credit was so poor that it could not even procure the financing necessary to secure a performance bond. Id. at 33. To create sufficient liquidity to secure the VC-25B subcontract, Boeing supposedly encouraged GDC to falsely claim that it had two other contracts in the works. Id. at 34–35. Neither was a legitimate source of income for GDC. Both contracts involved Boeing, but one had been cancelled and the other was simply never awarded to GDC. See id. at 35–36.

Boeing awarded the VC-25B subcontract to GDC in April 2018. Id. at 33. Although Emerald never submitted a bid, see Dkt. No. 104 at 5, Bashir complains that other applicants (and GDC competitors) were more qualified to receive the subcontract because they have over 30 years of experience designing high-end aircraft interiors,

"were in compliance with the federal regulations and contractual requirements concerning foreign ownership status [and] financial solvency," and possessed the "necessary security clearances to receive classified and top-secret information." Dkt. No. 96 at 34. GDC's inexperience and insolvency soon caught up with the alleged conspirators in the form of "massive performance problems." Id. at 48; see also id. at 47–50 (cataloguing deficiencies and delays). Boeing, however, did not report this to the Government. Instead, it purportedly certified GDC's compliance with all contractual and regulatory requirements "for the next several years" to continue collecting Government payments under the VC-25B prime contract and "curry favor with" Saudi Arabia. Id. at 38–40; see also id. at 50 ("Boeing falsely represented and certified to the U.S. Government that its major subcontractor for Air Force One complied with the numerous material [Federal Acquisition Regulations] . . . [and] continued making and accepting progress payments[.]").

Meanwhile, Boeing management informed Emerald that its bid on the India Head of State Project was the "best technical, best price, and lowest execution risk", and met with Emerald's management team to "confirm[] that Emerald had won" the project. Id. at 40–41. Bashir thereafter "receiv[ed] reports" that Dunmire and other "higher-level executives at Boeing" were actively lobbying to award the subcontract to GDC. Id. at 41. Emerald's fears were confirmed when, several days later, Boeing awarded the India Head of State subcontract to GDC. Id.

In response, Bashir and Emerald filed a confidential ethics complaint with Boeing "detailing the disturbing irregularities and fraudulent conduct [that Bashir] personally

witnessed and . . . [were] reported to him by other Boeing employees and competitors[.]" Id.; see also id. at 42–43 (summarizing issues raised in ethics complaint). However, instead of using this information to "impartially investigate" the allegations, Boeing took steps to "mitigate the impact and negative fallout[.]" Id. at 42–43. Bashir claims that he partook in several calls with Boeing's in-house counsel, who "grill[ed]" and "cross-examin[ed]" him on his sources, asked whether he had shared any of the information with the Government, and instructed him "not to discuss this with anyone else within Boeing[.]" Id. at 43. Boeing then went "radio silent" and never followed up with Bashir on the results of its investigation. Id. at 43–44.

In early 2019, GDC completed work on the Saudi Government's Boeing 787-8 aircraft. Id. at 44. The Saudi Ministry of Finance thereafter "abandoned and forfeited all ownership interest and affiliation with GDC[.]" Id. at 45. MAZ Aviation Consulting, a company owned primarily by Defendant Mohammad Hamad A. Al Zeer, a Saudia Arabian citizen, subsequently acquired 100 percent ownership of GDC. Id. at 6, 45. Bashir contends that Al Zeer and "other Saudi insiders" drained GDC's remaining capital and "enriched themselves" with funds "paid by the U.S. taxpayers in connection with the Air Force One Subcontracts." Id. at 46; see also id. at 3 n.5.[4]

Bashir initiated this qui tam suit in April 2019. Dkt. No. 1. He alleged that Boeing, GDC, Dunmire, and Al Zeer knowingly caused to be presented false or fraudulent claims for payment, 31 U.S.C. § 3729(a)(1)(A) (Count 1); knowingly caused to be made or used

---

[4] As explained in the Court's previous Order, Bashir did not timely serve Al Zeer under Rule 4 and the Court permitted Bashir to refile his motion for substituted service under Rule 4(f)(3) or Al Zeer may be dismissed without prejudice. Dkt. No. 92 at 6–7 n.4; see also Dkt. Nos. 87–88, 90. Bashir did not do so after filing his Second Amended Complaint. Accordingly, the Court dismisses Defendant Al Zeer without prejudice.

a false record material to a false or fraudulent claim, id. § 3729(a)(1)(B) (Count 2);

knowingly conspired to present false or fraudulent claims, id. § 3729(a)(1)(C) (Count 3);

violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (Count 4); and retaliated

against him for pursuing an FCA qui tam action, 31 U.S.C. § 3730(h) (Count 5). Dkt. No.

1 at 14–19.[5] Following several extensions of the intervention window, the Government

declined in January 2021 to proceed with the action. Dkt. Nos. 5–6, 11–12, 18, 20, 22–

25; see 31 U.S.C. § 3730(b)(2), (b)(3), (b)(4)(B).

By April 2021, mounting insolvency-driven delays forced Boeing to cancel its

subcontracts with GDC and sue the company in Texas state court for breach of contract.

Dkt. No. 96 at 51–52. That same month, GDC initiated Chapter 11 bankruptcy

proceedings in the Western District of Texas. Id. at 52. Bashir filed a proof of claim in

those proceedings summarizing the same factual and legal allegations raised in his qui

tam complaint. Id. at 52–53.

While these bankruptcy proceedings were ongoing, Bashir filed and served on the

Government his first amended qui tam complaint. Dkt. Nos. 61, 64. In that pleading he

claimed that Boeing knowingly caused to be presented false or fraudulent claims for

payment and knowingly caused to be used a false record material to a false or fraudulent

claim, 31 U.S.C. § 3729(a)(1)(A)–(B) (Count 1);[6] all Defendants knowingly conspired to

present false or fraudulent claims, 31 U.S.C. § 3729(a)(1)(C) (Count 2); Boeing

knowingly retained overpayments, id. § 3729(a)(1)(G) (Count 3); all Defendants violated

---

[5] Bashir alleged Count 5 against only Boeing and Dunmire. Id. at 18.

[6] Bashir's amended complaint combined his 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B) claims under one count. Dkt. No. 61 at 53–54.

the Anti-Kickback Act, 41 U.S.C. § 8702 (Count 4); and all Defendants were unjustly enriched by their false claims (Count 5). Dkt. No. 61 at 52–61. The Government again declined to intervene. Dkt. Nos. 69–70, 73. Defendants Boeing and Dunmire filed a motion to dismiss, which the Honorable Lauren King granted along with leave for Bashir to file a second amended complaint. Dkt. Nos. 77, 92.

Bashir has now filed his second amended qui tam complaint—the operative pleading in this action. Dkt. Nos. 96, 98. Bashir advances the same five claims as he did in the first amended qui tam complaint. See Dkt. No. 96 at 57–65. The Government declined to intervene for a third time. Dkt. No. 99. Boeing and Dunmire moved to dismiss the Second Amended Complaint. Dkt. No. 104. On January 6, 2025, Judge King transferred this case to the undersigned judge.

## II.   DISCUSSION

The Court begins with the governing standard. It then discusses whether Bashir's claims survive dismissal. As explained below, they once again do not.

## A.   Legal Standard – Rules 8(a) and 9(b)

Dismissal under Rule 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035, 1041 (9th Cir. 2010). At this stage, the Court accepts as true all well-pleaded factual allegations in the complaint and construes them in the light most favorable to the relator-plaintiff. United States v. Corinthian Colls., 655 F.3d 984, 991 (9th Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)); <u>see</u> Fed. R. Civ. P. 8(a)(2) (a plaintiff must make a "short and plain statement of the claim showing that the pleader is entitled to relief"). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 556).

The standard is more demanding when a party alleges fraud or mistake. In that case, the party must "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Qui tam actions under the FCA involve allegations of fraud, meaning they must meet both Rule 8(a)'s plausibility requirements and Rule 9(b)'s more demanding particularity requirement. <u>Corinthian Colls.</u>, 655 F.3d at 992. Conclusory allegations of fraud are therefore insufficient, <u>see</u> <u>Bly-Magee v. California</u>, 236 F.3d 1014, 1019 (9th Cir. 2001), as are "[b]road allegations that include no particularized supporting detail." <u>United States ex rel. Swoben v. United Healthcare Ins. Co.</u>, 848 F.3d 1161, 1180 (9th Cir. 2016) ("<u>Swoben</u>"). To satisfy Rule 9(b), a relator-plaintiff must "identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" <u>United States ex rel. Anita Silingo v. WellPoint, Inc.</u>, 904 F.3d 667, 677 (9th Cir. 2018) ("<u>Silingo</u>") (quoting <u>Cafasso, U.S. ex rel. v. Gen.</u>

1    _Dynamics C4 Sys., Inc._, 637 F.3d 1047, 1055 (9th Cir. 2011) ("_Cafasso_")); _see_ _also_

2    _Neubronner v. Milken_, 6 F.3d 666, 672 (9th Cir. 1993) ("The complaint must specify

3    such facts as the times, dates, places, benefits received, and other details of the alleged

4    fraudulent activity.").

5         Rule 9(b)'s heightened pleading standard serves two purposes. First, the rule

6    ensures that allegations are "specific enough to give defendants notice of the particular

7    misconduct which is alleged to constitute the fraud charged so that they can defend

8    against the charge and not just deny that they have done anything wrong." _Bly-Magee_,

9    236 F.3d at 1019. The Ninth Circuit has accordingly suggested that the "most basic

10   consideration" in judging a complaint under Rule 9 "is the determination of how much

11   detail is necessary to give adequate notice" to the defendant "and enable that party to

12   prepare a responsive pleading." _Swoben_, 848 F.3d at 1180 (internal quotation marks

13   omitted) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and

14   Procedure § 1298 (3d ed. 2016)). Second, the rule serves "to deter the filing of

15   complaints as a pretext for the discovery of unknown wrongs," shield defendants "from

16   the harm that comes from being subject to fraud charges," and "prohibit plaintiffs from

17   unilaterally imposing upon the court, the parties and society enormous social and

18   economic costs absent some factual basis." _Bly-Magee_, 236 F.3d at 1018.

19   **B.    Count 1: Section 3729(a)(1)(A) and (a)(1)(B) (Against Boeing)**

20        The FCA makes liable anyone who "knowingly presents, or causes to be

21   presented, a false or fraudulent claim for payment or approval" or "knowingly makes,

22   uses, or causes to be made or used, a false record or statement material to a false or

fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(A)–(B). A "claim" under the statute "includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. 176, 182 (2016) ("Escobar"); see 31 U.S.C. § 3729(b)(2)(A). The archetypal qui tam FCA action involves a private company overcharging under a government contract—a situation in which the claim for payment "is itself literally false or fraudulent." United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1170 (9th Cir. 2006) ("Hendow"). However, a claim under the FCA can also be false "where a party merely falsely certifies compliance with a statute or regulation as a condition [of] government payment." Id. at 1171. A false certification claim requires the relator-plaintiff to show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." Id. at 1174. Defendants once again challenge the falsity and materiality elements of Bashir's claims. See Dkt. No. 104 at 7–17; see also Dkt. No. 77 at 15, 24.

"There are two cognizable theories of liability for legally false claims: express false certification and implied false certification." Silingo, 904 F.3d at 675. Express false certification occurs when "the entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted." Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010) ("Ebeid"). "Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by

submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." Id.

Bashir once again raises both theories. Dkt. No. 96 at 57–58. He claims that Boeing's prime contracts with the Air Force obligated Boeing and its subcontractors "to represent and certify . . . full compliance with all contract provisions and mandatory federal statutes and regulations," and that Boeing nonetheless "knowingly and deliberately made false representations and certifications to the U.S. Government in connection with claims for payment on the VC-25A and VC-25B Programs." Dkt. No. 96 at 58. According to Bashir, Boeing "knew, but failed to disclose to the U.S. Government" several contractual, statutory, and regulatory violations when it "fraudulently awarded" GDC the VC-25A and VC-25B subcontracts, "as well as each time Boeing sought and received milestone payments" under its prime contracts. Id. at 54–55, 58.

The Second Amended Complaint alleges that Boeing violated and then falsely certified compliance with the following statutes, regulations, and contractual provisions[7]:

- "The source selection process was not the result of open, fair, full, and impartial competition, in violation of Boeing's prime contract with the U.S. Government and 10 U.S.C. § 2304";
- "GDC was owned, influenced, and controlled by the Saudi Government, in violation of Boeing's prime contract with the U.S. Government; 10 U.S.C. § 2536; 48 C.F.R. §§ 252.209-7001 and 7002; 32 C.F.R. Part 117 (NIPSOM)";
- "GDC was financially insolvent, incapable of performing, had made numerous[,] material false representations in connection with source selection, and did not comply with 48 C.F.R. §§ 9.103, 9.104-4; 48 C.F.R. § 52.203-13";

---

[7] The only difference between the provisions set forth in the Second Amended Complaint and those in the First Amended Complaint is that the following bullet point is absent in the operative pleading: "GDC did not and could not obtain the performance bond required by Boeing's prime contract with the U.S. Government and 48 C.F.R. § 28.102-2." See Dkt. No. 104-1 at 67–68.

- "GDC did not and could not comply with the mandatory requirements for a DX-A1 Rated Order[8], in violation of Boeing[']s prime contracts with the U.S. Government, as well as the [Defense Priorities & Allocations System] ("DPAS") requirements, and 15 C.F.R. Part 700";
- "GDC was in violation of the security requirement for safeguarding classified and top-secret information, in violation of Boeing's prime contract with the U.S. Government, as well as 48 C.F.R. § 52.204-2; 32 C.F.R. Part 117; [International Traffic in Arms Regulations] ('ITAR') and Trade Control laws, and 22 C.F.R. Part 120 to 130";
- "GDC was prioritizing the completing of the Saudis' 787-8 Aircraft and 777ER Aircraft and using funds received under the Air Force One Subcontracts to complete the Saudis' 787-8 and 777ER Aircraft"; and
- "Defendants' conduct constituted violations of the Anti-Kickback Statutes [sic] under 41 U.S.C. § 8702, 48 C.F.R. § 3.502-2 and 48 C.F.R. § 52.203-7."

Id. at 58–59; see also id. at 11–18 (discussing statutes and regulations that Boeing and GDC allegedly violated and falsely certified compliance with).

The Court previously concluded that Bashir failed to sufficiently allege materiality for any underlying statutory, regulatory, or contractual violation. Dkt. No. 92 at 22. This Court once again reaches the same conclusion for Bashir's express and implied false certification claims.

A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision to give rise to liability under the FCA. Escobar, 579 U.S. at 192. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). This standard is "demanding."

---

[8] "DX" is the highest level of priority established under the Defense Priorities & Allocations Systems. 15 C.F.R. § 700.11(a). "A1" is a program identification symbol that corresponds to an approved program relating to aircraft. See Schedule I to 15 C.F.R. Part 700. Thus, a DX-A1 Rated Order is the highest-level priority order for aircraft. See 15 C.F.R. § 700.11(c).

*Escobar*, 579 U.S. at 194. Federal courts will enforce it "rigorously" to shield government contractors from "onerous and unforeseen FCA liability as the result of noncompliance with any of potentially hundreds of legal requirements established by contract." United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1271 (D.C. Cir. 2010) (internal quotation marks omitted).

A misrepresentation is not per se material "merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment," or because the Government retains the option to decline payment if it knows of the defendant's noncompliance. *Escobar*, 579 U.S. at 194. The Government's decision to expressly identify a provision as a condition of payment is relevant to, but not dispositive of, the materiality inquiry. Id. at 194–95.

A relator-plaintiff must therefore plausibly allege that the statutory, regulatory, or contractual requirements are "so central" to the claims that the Government "would not have paid these claims had it known of [the] violations." Id. at 196; see Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc., 953 F.3d 1108, 1121 (9th Cir. 2020) ("Winter"). Whether a provision is "so central" that it goes "to the very essence of the bargain is a functional rather than formulistic, inquiry." *Escobar*, 579 U.S. at 193 n.5; United States ex rel. Taylor v. Boyko, 39 F.4th 177, 190 (4th Cir. 2022). The Ninth Circuit has interpreted *Escobar* as a "gloss" on the materiality analysis that requires district courts to evaluate three factors: (1) whether the Government's payment was conditioned on compliance with the statutory, regulatory, or contractual requirement at issue; (2) the Government's past enforcement of the requirement, i.e., how it has treated

similar violations (this factor looks to the Escobar criteria); and (3) the magnitude of the

violation. United States ex rel. Rose v. Stephens Inst., 909 F.3d 1012, 1020–22 (9th Cir.

2018) ("Rose"); UPPI LLC v. Cardinal Health, Inc., 2022 WL 3594081, at *3 (9th Cir.

Aug. 23, 2022).

>    1. Factor one: Whether the Government's payment was conditioned on
>       compliance with the statutory, regulatory, or contractual requirement at issue.

Bashir's First Amended Complaint was "replete with conclusory assertions that

the requirements at issue were material." See Dkt. No. 92 at 24. In the Order on

Defendants' first motion to dismiss, the Court noted two major concerns: (1) Bashir never

explained why the cited statutes, regulations, and prime contract provisions were material

to securing Government payment, and (2) Bashir failed to and must plausibly allege that

the requirements at issue were "so central" to Boeing's claims for payment that the

Government would not have issued progress payments on the VC-25 prime contracts had

it known about the violations. Dkt. No. 92 at 24. The Court now analyzes the allegedly

applicable regulations that Bashir relies on.

>    *(a) DPAS requirements for "Rated Orders"*

Bashir alleges that the prime contracts between Boeing and the Government for

the VC-25B Program expressly reference and incorporate DPAS requirements. Dkt. No.

96 at 13. Bashir is correct. The Solicitation[9] incorporates DPAS requirements by

reference, stating the project is a "rated order certified for national defense, emergency

---

[9] Bashir attached a "true and correct copy" of "the Solicitation Offer and Award of Prime Contract to Boeing for VC-25B." Dkt. No. 96 at 13; see Dkt. No. 96-1. The Court refers to this document as the "Solicitation".

preparedness, and energy program use, and the Contractor shall follow all the requirements of [DPAS] regulation." Dkt. No. 96-1 at 18. The DPAS implements the Defense Production Act of 1950, 50 U.S.C. §§ 4501-68, and 15 C.F.R. § 700 implements the DPAS. 15 C.F.R. § 700.1. The DPAS "establishes procedures for the placement, acceptance, and performance of priority rated contracts and orders (other than contracts of employment) and for the allocation of materials, services, and facilities for approved programs." Id.

While Bashir broadly claims that Boeing is bound by all DPAS requirements, he specifically highlights six subsections in the Second Amended Complaint. See Dkt. No. 96 at 13–14. Bashir contends that the statutory requirements of a DX-A1 Rated contract are the "most strict and stringent requirements imposed by Congress in defense contracting." Id. at 9. He also claims that "[f]ailure to comply with every element of a DX-A1 rated order and the DPAS regulations requires a written authorization and approval to proceed from the Secretary of Defense and/or Congressional approval"; a United States Air Force procurement officer lacks the authority to waive these "material statutory requirements." Id. But Bashir cites to no subsection of the DPAS to support these claims. The Defense Production Act limits certain actions without congressional approval, but neither are applicable here. See 50 U.S.C. § 4514 (Wage or price controls and chemical or biological weapons).

Bashir claims the prime contract required Boeing to certify compliance with the provisions of the DPAS annually and each time Boeing presented a claim to the Government for a milestone payment. Dkt. No. 96 at 13. But the section of the

Solicitation Bashir cites to does not include DPAS requirements for annual certification. Instead, that provision requires annual disclosure on topics such as information of ownership or control by the Government of a country that is a state sponsor of terrorism and the performance of the contract's terms in a foreign country. Dkt. No. 96-1 at 103–05.

In <u>Hendow</u>, a case that predates <u>Escobar</u>, the Ninth Circuit rejected an argument that a condition of a university's participation in a "program participation agreement" with the Department of Education was not a condition of payment. 461 F.3d at 1175–76. The eligibility of the university under Title IV and the Higher Education Act of 1965 ("HEA") was "*explicitly* conditioned, in three different ways", on compliance with the HEA's "incentive compensation ban." <u>Id.</u> at 1175. The three sources of authority the <u>Hendow</u> court relied on included a federal statute, a federal regulation, and the program participation agreement itself. <u>Id.</u> at 1175–76. The university argued that the ban is merely a condition of participation, not a condition of payment. <u>Id.</u> at 1176. However, the <u>Hendow</u> court stated that "[a]n explicit statement, however, is not necessary to make a statutory requirement a condition of payment." <u>Id.</u> at 1177. The <u>Hendow</u> court also rejected an argument that the incentive compensation ban is nothing more than "one of hundreds of boilerplate requirements with which [the defendant] promises compliance," stating that "[t]his may be true, but fraud is fraud, regardless of how 'small.'" <u>Id.</u> at 1175. In <u>Rose</u>, the Ninth Circuit acknowledged that after <u>Escobar</u>, "it is clear that noncompliance with the incentive compensation ban is not material per se"; the triple-conditioning of Title IV funds on compliance with the incentive compensation may not

be sufficient, without more, to prove materiality, but "it is certainly probative evidence of materiality." 909 F.3d at 1020.

Bashir cites <u>Hendow</u> for the proposition that Boeing's requirement to comply with the DPAS regulations is a condition for payment. Dkt. No. 111 at 13–14. <u>Hendow</u> is distinguishable. Compliance with the Higher Education Act's incentive compensation ban was explicitly mandated by a federal statute, a federal regulation, and the <u>Hendow</u> parties' program participation agreement itself. 461 F.3d at 1175–76. Here, Bashir has not directed the Court to any explicit DPAS regulation or provision in the Solicitation that conditions payment on compliance with DPAS. Furthermore, under <u>Rose</u>, the presence of "triple conditioning" of Government funds on Boeing's compliance with the DPAS is not dispositive without more.

Bashir argues that the DPAS requirements are "essential to the overall purpose of the Air Force One contract" and not "extraneous conditions to the VC-25B Prime Contract." Dkt. No. 111 at 12, 14.

In <u>Winter</u>, the court held that the relator sufficiently pled materiality at the motion to dismiss stage. 953 F.3d at 1116, 1122. The relator argued that the defendants' claims for payment under Medicare were false in that defendants submitted false certifications of medical necessity for services that were not were not medically necessary and economical. <u>Id.</u> at 1115–16, 1121–22 (internal quotation marks omitted). In concluding that a false certification of medical necessity can be material, the court noted that Congress explicitly prohibited payment for treatment "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a

malformed body member." Id. at 1122 (quoting 42 U.S.C. § 1395y(a)(1)(A)). The court

also observed that Medicare regulations require all doctors to sign an acknowledgment

that states that "Medicare payment to hospitals is based in part on each patient's principal

and secondary diagnoses and major procedures performed on the patient, as attested to by

the patient's attending physician. Anyone who misrepresents, falsifies, or conceals

essential information required for payment of Federal funds may be subject to fine,

imprisonment, or civil penalty under applicable Federal laws." Id. (quoting 42 C.F.R. §

412.46(a)(2)). Finally, the court noted that "[i]n addition to *highlighting the above*

*Medicare statutes and regulations*, *Winter's complaint*" alleged that the government

would not have paid the defendants' false claims if the true facts were known. Id.

(emphasis added). Taken together, the court concluded that Winter submitted sufficient

allegations that [d]efendants' false certification of the medical necessity requirement is

'so central' *to the Medicare program* that the government 'would not have paid these

claims had it known' that the inpatient hospitalizations were, in fact, unnecessary." Id.

(emphasis added). Winter sufficiently satisfied the materiality element. Id.

　　　　Bashir's confuses the relevant inquiry concerning the importance of the DPAS'

requirements. As explained in Winter, the question is whether the allegedly violated

regulations are essential to the overall purpose of the body of regulations they belong to.

See 953 F.3d at 1122. Here, Bashir need to have addressed how the DPAS requirements,

such as the six he specifically highlighted, are so central to the overall purpose of the

DPAS, *not* the Air Force One contract. Unlike the complaint in Winter, the Second

Amended Complaint contains no citations to specific DPAS regulations that state

Boeing's compliance with the any relevant DPAS regulation is a condition of payment.
Bashir does not assert that the Government would not have paid Boeing's false claims
had it known about Defendants' activities, only that he is not aware of any instance in
which the Government continued to make payments after learning of DPAS regulatory
violations. See Dkt. No. 96 at 12–15. At best, the operative pleading here satisfies half of
what the Winter court considered important when concluding that the relator there
sufficiently pled materiality.

In two new paragraphs in the Second Amended Complaint under the header
"Materiality," Bashir asserts that strict adherence to the contractual and regulatory DPAS
requirements were of "utmost importance" to the VC-25 programs and contractors who
violate those strict provisions are subject to criminal penalties. Dkt. No. 96 at 15; see 15
C.F.R. § 700.74. Bashir does not allege that Defendants committed criminal violations.
Bashir's discussion of the historical background of the Weapon Systems Acquisition
Reform Act also provides no insight into what DPAS regulatory requirements were
conditions for payment by the Government.

In conclusion, Bashir has not sufficiently alleged that satisfaction of any of the
DPAS requirements were legal or contractual conditions for payment, the Government
would not have paid Boeing's claims had it been aware of Defendants' activities, and any
specific DPAS regulation was essential to the overall purpose the DPAS.

### (b) Ownership or Control by a Foreign Country

Bashir claims that Boeing failed "to disclose if any of its subcontractors [were]
foreign owned or controlled and obtain informed consent . . . from the U.S. Department

of Defense to use that subcontractor" as required under 48 C.F.R. § 252.209-7001, 48 C.F.R. § 252.209-7002, and 10 U.S.C. § 2536. Dkt. No. 96 at 20. These regulations are inapplicable. 48 C.F.R. § 252.209-7001 has not been in effect since December 10, 2014, several years before the VC-25B subcontract was awarded in April 2018, and applies to covered entities owned or controlled by state sponsors of terrorism. Bashir does not cite any authority supporting a claim that Saudi Arabia has been so classified. The Solicitation explicitly confirms 48 C.F.R. § 252.209-7002's inapplicability. See Dkt. No. 96-1 at 104 (where the Contracting Officer was to indicate applicability of certifications via a check, a "N/A" was listed next to § 252.209-7002). The Solicitation lacks any reference to 10 U.S.C. § 2536 (renumbered to 10 U.S.C. § 4874), and Bashir has not submitted allegations to demonstrate how this regulation was "so central" to the purpose of the relevant body of regulations to which it belongs. Escobar, 579 U.S. at 196.

### (c) Fairness in Competition

Bashir claims Boeing knew but failed to disclose that the source selection process was not the result of open, fair, full, and impartial competition in violation of the prime contract and 10 U.S.C. § 2304 (2020) (repealed 2021). This statute is no longer in effect. Based on the statutory language in effect during the source selection process, the statute's guarantee of "full and open competition" applied to the "head of an agency in conducting a procurement for property or services." 10 U.S.C. § 2304(a)(1) (2011) (amended 2017). This statute does not regulate a private contractor's choice of subcontractors and therefore is not applicable to Boeing.

Bashir also claims that the prime contract expressly incorporated and mandated Boeing's compliance with 48 C.F.R. § 52.244-5. Dkt. No. 96 at 21. That regulation states that "[t]he Contractor shall select subcontractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract." Even if this provision is incorporated in the prime contract, Bashir has not submitted allegations to support a conclusion that this regulation is a condition for payment by the Government or that it was essential to the broader set of regulations to which it belonged, i.e., not a regulation where noncompliance was "minor or insubstantial". Escobar, 579 U.S. at 178; see also Winter, 953 F.3d at 1121–22.

    *(d) Performance Bonds*

Bashir alleges that "GDC could not obtain a performance bond", but "Boeing ignored this requirement" and "concealed these facts from the U.S. Government in violation of Section AA02 of the Contract and 48 C.F.R. § 28.102-2." Dkt. No. 96 at 33. As to the contract citation, Bashir does not allege facts to support why a violation would be so central to Boeing's claims to the Government for payment under the contract. 48 C.F.R. § 28.102-2 regulates bonds issued under to 40 U.S.C. §§ 3131–34, formerly known as the Miller Act. 48 C.F.R. § 28.102-1(a). The statutory provisions apply to contracts worth more than $100,000 for "the construction, alteration or repair of any public building or public work of the Federal Government." 40 U.S.C. § 3131(b). Air Force One is neither a public building nor a public work, so the requirements of 48 C.F.R. § 28.102-2 are not applicable to Boeing.

*(e) GDC's Financial Insolvency and Incompetence*

Bashir alleges 48 C.F.R. §§ 9.103, 9.104-1, 9.104-4, and the prime contract require Boeing to make certain affirmative representations and certifications concerning any subcontractors. Dkt. No. 96 at 16–17.

48 C.F.R. § 9.103(a) requires that contracts be awarded to "responsible prospective contractors only." To be deemed responsible, a prospective contractor must satisfy seven criteria, including having adequate financial resources to perform the contract or the ability to obtain them, being able to comply with the required performance schedule, taking into consideration all existing commercial and governmental business commitments, and possessing a satisfactory performance record. 48 C.F.R. § 9.104-1. Generally, prospective prime contractors are responsible for determining the responsibility of their prospective subcontractors. 48 C.F.R. § 9.104-4. These provisions are not explicitly referenced in the Solicitation, and Bashir offers no citation to suggest otherwise.

Throughout the Second Amended Complaint, Bashir has explained the history of GDC's financial well-being, GDC's experience in completing airplane contracts requiring similar technical skill or know-how, and the general state of GDC's business. Boeing allegedly knew of this information yet continued to certify with the Government that it complied with its contractual obligations. While the Court must accept as true all well-pleaded factual allegations and construe them in Bashir's favor, Bashir again fails to do more than simply identifying these regulations. Bashir does not explain how Boeing's compliance with 48 C.F.R. §§ 9.103, 9.104-1, and 9.104-4 served as a condition for

payment by the Government or how any of these regulations were "so central" to the overall purpose of the Federal Acquisition Regulations System, Title 48. Escobar, 579 U.S. at 196.

Bashir also claims that Boeing was "required to exercise due diligence to prevent and detect criminal conduct in connection with the award and performance of the prime contracts and subcontracts" and "[i]f Boeing obtain[ed] evidence" of an FCA violation, to "immediately report" to the Inspector General. Dkt. No. 96 at 22. Bashir relies on 48 C.F.R. § 52.203-13(b)(2), which requires contractors to (i) "[e]xercise due diligence to prevent and detect criminal conduct; and (ii) [o]therwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law." The first sub-provision is inapplicable because Bashir alleges no criminal law violations against GDC. But Bashir again fails to submit allegations to demonstrate how Boeing's false certification of the second sub-provision is "so central" to the Contractor Code of Business Ethics and Conduct, rather than an "insignificant regulatory or contractual violation[]", that the Government would not have paid Boeing's claims had it known that Boeing failed to promote an ethical organizational culture. Escobar, 579 U.S. at 196. Bashir's reliance on an Eleventh Circuit case, Marsteller ex rel. United States v. Tilton, is unavailing. 880 F.3d 1302 (11th Cir. 2018). There, the court noted that the Contractor Code of Ethics, part of the Federal Acquisitions Regulations and a mandatory term of acquisitions contracts, requires disclosure of any credible evidence of potential criminal law violations involving fraud, conflict of interest, bribery, or gratuity violations. Id. at 1313. Bashir alleges no such violations here.

The Contractor Code of Ethics also requires the contractor to timely disclose in writing to the Government credible evidence that a principal, employee, agent, or subcontractor has violated the FCA's civil provisions in connection with the award or performance of the contract at issue and related subcontracts. 48 C.F.R. § 52.203-13(b)(3)(i)(B). Bashir does not assert that GDC, the subcontractor, submitted a false claim to the Government for payment. Dkt. No. 104 at 22. Instead, Bashir's claims are aimed more directly at Boeing. But Bashir's allegations do not support an assertion that Boeing's compliance with any of these regulations were conditions for payment by the Government.

> (f)  *ITAR and the National Industrial Security Program Operating Manual ("NISPOM")*

Bashir alleges Boeing was required to abide by "all" provisions of ITAR, 22 C.F.R. Part 120 to 130. Dkt. No. 96 at 19. These allegations are conclusory, overbroad, and fail to satisfy Rule 9(b)'s particularity requirement. See Dkt. No. 96 at 19. Allegations of fraud must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Bly-Magee, 236 F.3d at 1019. A generalized allegation that Boeing violated ITAR, which contains over 150 subsections, without more, is insufficient.

Bashir's allegations related to NISPOM, 32 C.F.R. Part 117, suffer from the same problem. He cites five NISPOM subsections as "example[s]," including subsections on procedures, reporting requirements, subcontracting, foreign ownership, control, or influence, and safeguarding classified information. See Dkt. No. 96 at 19–20; see also 32

C.F.R. §§ 117.7–.8, 117.11, 117.15, 117.17. NISPOM implements policy, assigns

responsibilities, establishes requirements, and provides procedures "for the protection of

classified information that is disclosed to, or developed by contractors of the U.S.

Government." 32 C.F.R. § 117.1(a). 32 C.F.R. § 117.7(a), cited by Bashir, provides that

"[c]ontractors will protect all classified information that they are provided access to or

that they possess." Contractors and subcontractors are required to submit reports to the

CSA[10] concerning any information coming to their attention that may indicate that

classified information cannot be adequately protected by a subcontractor or other

circumstances impacting the validity of the eligibility for access to classified information

of any subcontractors. Id. at § 117.8(c)(10)(i). Contractors also "will report any pre-

contract negotiation or award not placed through a CSA" that involves, or may involve,

the release or disclosure of U.S. classified information to a foreign interest. Id.

at § 117.8(c)(12)(i). Before a prime contractor may release or disclose classified

information to a subcontractor, a determination must be made that (1) "access to

classified information will be required", and (2) "such access serves a legitimate U.S.

government requirement for the performance of a 'classified contract' in accordance with

§ 117.9(a)[.]" See id. at § 117.17(a)(1). "Prime contractors are responsible for

communicating the appropriate security requirements to all subcontractors." Id. Prime

contractors "will verify" whether the prospective subcontractors have the appropriate

entity eligibility determination and classified information safeguarding capability. Id. at

---

[10] "CSA" refers to a cognizant security agency, which is an agency designated as having National Industrial Security Program implementation and security responsibilities for its own agencies. See 32 C.F.R. § 117.3. The CSA here is the Department of Defense. Id.

§ 117.17(a)(2)(i). It is the intent of the U.S. Government to allow foreign investment consistent with the national security interests of the United States. 32 C.F.R. § 117.11(a). "A U.S. entity that is in process for an entity eligibility determination for access to classified information and subsequently determined to be under [Foreign Ownership, Control, or Influence ("FOCI")] is ineligible for access to classified information unless and until effective security measures have been put in place to negate or mitigate FOCI to the satisfaction of the CSA." Id. at § 117.11(a)(3). When FOCI factors not related to ownership are present, "the CSA will determine if positive measures will assure the CSA that the foreign interest can be effectively mitigated and cannot otherwise adversely affect performance on classified contracts." Id. at § 117.11(d)(1). For example, "[d]emonstration of financial viability independent of foreign interests." Id. at § 117.11(d)(1)(iii).

Despite highlighting these regulations of the many that comprise NISPOM, in neither the Second Amended Complaint nor Bashir's response brief does Bashir show that these regulations are essential to the overall purpose of NISPOM. The Second Amended Complaint does not refer to any statute, rule, regulation, or contract that conditions payment on compliance with NISPOM. Additionally, Bashir's claim that Boeing is required to represent and certify that its subcontractors comply with *all provisions* of NISPOM is unsupported by any citation to the prime contract and is insufficient under Rule 9(b). See Ebeid, 616 F.3d at 1000 (holding that general allegations lacking any details or facts setting out the "who, what, when, where, and

1  how" are insufficient under Rule 9(b)). NISPOM contains 24 sections and each section

2  Bashir highlighted contains numerous subsections.

3       *(g) Anti-Kickback Prohibitions*

4       Bashir alleges Boeing's and Saudi Arabia's $22 billion joint venture, publicly

5  announced on March 30, 2018, served as a basis for a quid pro quo to steer the VC-25B

6  subcontracts to GDC while Boeing would invest $450 million in facilities and equipment

7  inside Saudi Arabia. Dkt. No. 96 at 39–40, 61, 63. About a month after the public

8  announcement, Boeing awarded GDC the VC-25B subcontracts. See id. at 40, 61. Bashir

9  claims that "[u]pon information and belief," GDC provided incentives and kickbacks to

10 Dunmire in exchange for his role in steering those lucrative contracts to GDC. Id. at 61,

11 63. Bashir also alleges that Boeing received substantial financial benefits flowing from

12 the $22 billion joint venture. Id. at 40.

13      The Anti-Kickback Statute, 41 U.S.C. § 8702, 48 C.F.R. § 3.502-2, and 48 C.F.R.

14 § 52.203-7(b) prohibit any person from providing or offering any kickback and soliciting

15 or accepting any kickback in connection with a government contract or subcontract. 41

16 U.S.C. § 8703 imposes a reporting requirement on a prime contractor and subcontractors

17 who have reasonable grounds to believe 41 U.S.C. § 8702 may have been violated. 48

18 C.F.R. § 52.203-7(c)(2). Defendants argue that Bashir's allegations are "founded solely

19 upon 'information and belief'" and therefore fail to meet Rule 9(b)'s particularity

20 requirement. Dkt. Nos. 104 at 21, 112 at 11–12. Bashir did not respond. See Dkt. No.

21 111. Claims made on information and belief are generally not sufficiently particular

unless they accompany a statement of facts on which the belief is founded. <u>Shroyer v.</u> <u>New Cingular Wireless Servs., Inc.</u>, 622 F.3d 1035, 1042 (9th Cir. 2010).

The Court concludes that in this case, the allegations based solely on information and belief do not satisfy the Rule 9(b) particularity requirements. In addition, nothing in the allegations based on information and belief or otherwise contained in the Second Amendment Complaint address the issue of materiality, which is fatal to this claim.

*(h) Conclusion on Factor 1*

Bashir again falls short in offering more than conclusory allegations to show that the allegedly violated regulations are conditions for payment, "so central" to the broader body of regulations to which they belong, or even applicable to Defendants. <u>Escobar</u>, 579 U.S. at 196. Simply adding "material" or "materiality" without more throughout the operative pleading while describing Defendants' alleged violations does not make them so. This factor weighs in Defendants' favor.

2.  <u>Factor two: the Government's past enforcement of Boeing's alleged</u> <u>obligations</u>

This factor, which courts have further divided into three subfactors, considers how the Government has treated similar violations. <u>See</u> <u>Escobar</u>, 579 U.S. at 193–94; <u>see also</u> <u>Rose</u>, 909 F.3d at 1020. First, the Court asks whether there is "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance" with the alleged contractual obligations, because such a showing can help establish that the requirement was material. <u>Rose</u>, 909 F.3d at 1021. Second, the Court asks whether the Government has paid "a particular claim in full

despite its actual knowledge that" Boeing violated its obligations, because that is very strong evidence that those obligations were not material. Id. Third, the Court examines whether the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated and has signaled no change in position because that is strong evidence that the requirements are not material. Id.

(a) Subfactor 1

Bashir references one enforcement action involving the V-22 Osprey program that resulted in an FCA settlement. See DOJ Press Release (September 28, 2023) (https://www.justice.gov/opa/pr/boeing-company-pay-81-million-resolve-false-claims-act-allegations). There, the Government alleged that Boeing failed to "comply with certain contractual manufacturing specifications in fabricating composite components for the V-22 [Osprey military aircraft] at its facility." Id. Specifically, Boeing "failed to perform required monthly testing on autoclaves used in the composite cure process and was not in compliance with additional requirements related to the testing." Id.

Although this case involved a subcontractor's financial health, ownership, and qualifications to complete work on the Air Force One fleet, Bashir correctly notes that in the V-22 settlement case, the Government signaled its clear expectations that contractors adhere to their obligations. Dkt. No. 111 at 16 ("The government expects contractors to adhere to contractual obligations to which they have agreed and for which they have been paid." "Today's settlement demonstrates our commitment to hold accountable contractors who violate such obligations and undermine the integrity of the government's procurement process."). However, the relevant inquiry is whether there is evidence of

Boeing's knowledge of the Government's refusal to pay claims based on noncompliance with contractual obligations specific to this case, not merely contractual obligations generally. See Rose 909 F.3d at 1021 ("First, we ask whether there is 'evidence' that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance' with the incentive compensation ban."); United States v. Ctr. for Emp. Training, 2019 WL 424189, at *9 (E.D. Cal. Feb. 4, 2019) (stating the relevant inquiry is based on noncompliance "with the requirements at issue here."). Bashir makes no effort to compare Boeing's obligations in the V-22 case with those he alleges apply here. Given the circumstances, the Government's emphasis in a press release on the importance of following the agreed contractual terms is hardly surprising. And Bashir's singular example does not speak for the "mine run of cases."

In the Second Amended Complaint, Bashir claims that he is not aware of any instances in which the Government has knowingly continued to make payments on a DX-A1 Rated Order in the face of a contractor or subcontractor's violation of DPAS requirements and 48 C.F.R. § 52.244-5. Dkt. No. 96 at 15, 21. He also claims that the Government "consistently enforces [these] requirements." Id. at 21. Bashir's assertion is unsupported by citation to any authority and therefore conclusory.

This subfactor is neutral and does not weigh into the Court's analysis.

*(b) Subfactor 2*

The second subfactor concerns Defendants' arguments that the Government's history of continued payments to Boeing constitutes strong evidence that neither the underlying requirement nor misrepresentation is material. But the Government must have

*actual* knowledge that certain requirements were violated. Escobar, 576 U.S. at 195.

Courts have concluded that the Government's awareness of a relator's allegations is not

equivalent to actual knowledge of violations to establish materiality. See, e.g., United

States ex rel. Campie v. Gilead Scis., Inc., 862 F.3d 890, 906–07 (9th Cir. 2017)

(continued payment of claims by the government cannot be dispositive where the "parties

dispute exactly what the government knew and when calling into question its 'actual

knowledge'"); United States ex rel. Escobar v. Universal Health Servs., Inc., 842 F.3d

103, 112 (1st Cir. 2016) (holding that "mere awareness of allegations concerning

noncompliance with regulations is different from knowledge of actual noncompliance").

At the pleadings stage prior to discovery and a formal court ruling, the Government may

not necessarily have knowledge of all the material facts to evaluate the veracity of the

relator's allegations. United States ex rel. Foreman v. AECOM, 19 F.4th 85, 115 (2d Cir.

2021). Boeing fails to demonstrate the Government had actual knowledge of Boeing's

alleged violations.

Relatedly, courts have recognized that a federal agency may decide not to suspend

payment to a potentially liable FCA defendant for reasons unrelated to the materiality of

the defendant's false claims. See United States ex rel. USN4U v. Wolf Creek Fed. Servs.,

34 F.4th 507, 517 (6th Cir. 2022) ("There are a variety of factors unrelated to the

materiality of the allegations that could cause the Government to continue contracting

with a party after the Government becomes aware of alleged fraud"—e.g., "there could

be a lack of other suppliers," "other feasible procurement options", or "there could be

high costs associated with implementing another bidding process[.]"); see also United

States v. Molina Healthcare of Illinois, Inc., 17 F.4th 732, 744 (7th Cir. 2021) (complaint adequately alleged materiality despite government's continued contracting with defendant because "[m]any things could explain the government's continued contracting with Molina," such as "need[ing] time to work out a way not to prejudice Medicaid recipients" who relied on Molina's services); see also United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 917 (4th Cir. 2003) (noting that the government "might choose to continue funding the contract despite earlier wrongdoing by the contractor" because, for example, the contract is "advantageous to the government" or is too far along to terminate).

Boeing relies on several cases in an effort to distinguish this case from these principles. Dkt. 104 at 11–12. But each of those cases conducted a materiality analysis on motions for summary judgment, which requires a different analysis than the one required in this case and where records are much more developed. See United States ex rel. Berg v. Honeywell Int'l, Inc., 740 F. App'x 535, 538 (9th Cir. 2018) (holding relators failed to raise a triable issue as to materiality because the Government began paying the defendant's claims in 2003 up to at least 2008 despite being aware of the relators' fraud allegations since 2002 and the results of its own audit since 2003, and the problems with "infiltration rates" since 2004); United States ex rel. Kelly v. Serco, Inc., 846 F.3d 325, 334 (9th Cir. 2017) ("Kelly") (stating the relator "failed to establish a genuine issue of material fact regarding . . . materiality" where undisputed facts demonstrated that the agency was aware of defendant's noncompliance with a contractual requirement, continued paying under the contract, and eventually eliminated the requirement

altogether because "it provided minimal benefit"); <u>United States ex rel. Janssen v.</u>

<u>Lawrence Mem'l Hosp.</u>, 949 F.3d 533, 538–39 (10th Cir. 2020) (holding that the

evidence was insufficient to raise a fact issue as to materiality, where the evidence

showed that a Medicare contractor had investigated the relator's fraud allegations and the

contractor's documentation confirmed that Medicare had been made "aware of quality

issue" following completion of the investigation, but continued paying claims).

Consistent with the reasoning laid out by the <u>USN4U</u>, <u>Molina Healthcare</u>, and <u>Harrison</u>

courts, the Government's continued payments to Boeing here could be due to any of the

following reasons: a lack of other suppliers or other feasible procurement options, high

costs associated with implementing another bidding process, or the projects being too far

along to terminate now. At least within the realm of national security, few projects would

be more undesirable for the Government to see delayed than the maintenance and

development of the current and future Air Force One fleets.

This subfactor favors Bashir.

*(c) Subfactor 3*

The third subfactor also turns on the Government's "actual knowledge." <u>Escobar</u>,

576 U.S. at 195. Bashir makes several conclusory assertions that the Government does

not "regularly pay" claims when there is a violation but does not identify instances where

the Government has refused payment based on similar alleged violations, claiming to

have no knowledge of any such instance. Dkt. No. 96 at 12. But the record does not

establish that the Government had actual knowledge of the Defendants' alleged violations

of applicable regulations under the prime contracts. <u>See</u> <u>Rose</u> 909 F.3d at 1021.

This subfactor factors Bashir.

> *(d) Conclusion on Factor 2*

After considering all three subfactors together, the Court concludes that factor two weighs in Bashir's favor. He has provided some general evidence of the Government's actions in another FCA action, and Boeing cannot show that the Government had actual knowledge of its alleged violations.

3. <u>Factor three: the magnitude of the alleged violation.</u>

In the Order on Boeing's first motion to dismiss, the Court stated that Bashir's allegations related to the President's safety while aboard an Air Force One aircraft, national security concerns, and the impact of delays on such a high-priority Government project are "relevant to the magnitude factor" but do not "plausibly plead" the remaining two materiality considerations. Dkt. No. 92 at 24–25 (citing <u>Rose</u>).

The Second Amended Complaint adds little more beyond what Bashir had already alleged. Bashir does not argue otherwise, but insists he sufficiently pled the magnitude of the alleged regulatory violations and fraudulent course of conduct. Dkt. No. 111 at 21–22. Merely reiterating that the timely completion of the VC-25B Program was "of material importance to Congress and the U.S. Government" is not sufficient. Dkt. No. 96 at 8. Bashir failed to cure the deficiencies previously highlighted as to this factor. This factor weighs in Defendants' favor.

4. <u>Conclusion on Count 1</u>

The materiality test is holistic and no one factor is dispositive. <u>See</u> <u>Escobar</u>, 842 F.3d at 112. Despite the clear instructions in the Court's Order, <u>see</u> Dkt. No. 92, Bashir

has failed to adequately address the Court's concerns on the materiality element of his express and implied false certification claims. Bashir recognized that the Court previously concluded that allegations supporting two aspects of materiality were insufficient: "(1) whether the Government's payment was conditioned on compliance with the requirements at issue; or (2) how the government treated similar violations." Dkt. No. 111 at 2. Even if these deficiencies were cured in the Second Amended Complaint, and they were not, Bashir neglected to also allege that the requirements at issue were 'so central' to Boeing's claims for payment that the Government would not have issued progress payments on the VC-25A and VC-25B prime contracts had it known about the violations" by supplying "some supporting allegations to back up this assertion." Dkt. No. 92 at 24. "[E]vidence that the government 'would be entitled to refuse payment were it aware of the violation' is insufficient by itself to support a finding that the violation is material to the government's payment decision." Kelly, 846 F.3d at 334 (quoting Escobar, 579 U.S. at 195–96). Bashir's allegations do not go much further than general statements that Boeing's actions or inaction constituted violations of several allegedly applicable regulations. This is insufficient under the standards espoused in Rose and Escobar.

Because Bashir does not sufficiently plead materiality, his Section 3729(a)(1)(A) claim necessarily fails. So, too, does his Section 3729(a)(1)(B) claim. See Escobar, 579 U.S. at 335 (a false or fraudulent claim is an essential element of a use-of-false-statement claim).

The Court grants Defendants' motion to dismiss with respect to Count 1.

**C.      Count 2: Section 3729(a)(1)(C) (Against All Defendants)**

Bashir alleges that Defendants "knowingly conspired to present false or fraudulent claims for payment to the United States by failing to adhere to the regulations" identified in Count 1. Dkt. No. 96 at 60.

The FCA imposes liability on anyone who conspires to violate one of its provisions. 31 U.S.C. § 3729(a)(1)(C). However, "an underlying violation of the other subparagraphs constituting a claim under the FCA is required to state a claim for conspiracy to commit a violation of the FCA." Lesnik v. Eisenmann SE, 374 F. Supp. 3d 923, 940 (N.D. Cal. 2019). As the Court concluded above, Bashir has not adequately pleaded a false certification claim.

Defendants' motion to dismiss is granted with respect to Count 2.

**D.      Count 3: Section 3729(a)(1)(G) (Against Boeing)**

Bashir alleges that Boeing "presented numerous false claims for payment to the U.S. Government and knowingly retained the overpayments . . . when [it] failed to repay the money within 60 days." Dkt. No. 96 at 62.

Under the FCA's "reverse false claims" provision, liability attaches to anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government," or who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. § 3729(a)(1)(G); see Silingo, 904 F.3d at 676 (this subsection "is designed to cover Government money or property that is knowingly retained by a person even though they have no right to it."

This claim is also foreclosed by Bashir's failure to adequately plead a false claim. See Cafasso, 637 F.3d at 1056 ("The 'reverse false claims' provision does not eliminate or supplant the FCA's false claim requirement[.]"); Kelly, 846 F.3d at 336 ("Because [relator's] cause of action for submitting false or fraudulent claims for payment fails as a matter of law, so too did his 'reverse false claims' action.").

Defendants' motion to dismiss is granted with respect to Count 3.

## E.    Count 4: The Anti-Kickback Act (Against All Defendants)

Bashir reasserts his claim under the Anti-Kickback Act. Dkt. No. 96 at 63. Only the Government may bring a civil or criminal action to enforce violations of the Anti-Kickback Act. See 41 U.S.C. §§ 8706(a), 8707; United States ex rel. Howard v. Caddell Constr. Co., Inc., 2021 WL 1206584, at *33 (E.D.N.C. Mar. 30, 2021) ("The [Anti-Kickback Act] expressly provides a cause of action only for '[t]he Federal Government in a civil action,' and it does not provide its own basis like the False Claims Act for suit by a private plaintiff on behalf of the government." (alteration in original)); Bales v. AECOM N&E Tech. Servs., LLC, 2019 WL 13299349, at *1 (E.D. Wash. June 6, 2019) (holding the Anti-Kickback Act does not provide a private cause of action). Because the Government again declined to intervene, this claim must be dismissed.

Defendants' motion to dismiss is granted with respect to Count 4.

## F.    Count 5: Unjust Enrichment (Against All Defendants)

Bashir reasserts his unjust enrichment claim. Dkt. No. 96 at 64. The FCA does not grant a relator authority to assert equitable claims on the Government's behalf. See

1    United States ex rel. Ebu-Isaac v. INSYS Therapeutics, Inc., 2021 WL 3619958, at *11–

2    12 (C.D. Cal. June 9, 2021). Here, the Government once again declined to intervene.

3        Defendants' motion to dismiss is granted with respect to Count 5.

4    **G.    Leave to Amend**

5        Bashir requests leave to file yet another amended complaint. Dkt. No. 111 at 23–

6    25. Federal Rule of Civil Procedure 15(a)(2) directs district courts to "freely give leave

7    when justice so requires." The standard for leave to amend is "very liberal."

8    AmerisourceBergen Corp. v. Dialysist W., Inc., 465 F.3d 946, 951 (9th Cir. 2006). This

9    is because "the underlying purpose of Rule 15 [is] to facilitate [a] decision on the merits,

10   rather than on the pleadings or technicalities." Lopez v. Smith, 203 F.3d 1122, 1127 (9th

11   Cir. 2000). A district court should therefore deny leave to amend "only if there is strong

12   evidence of undue delay, bad faith or dilatory motive on the part of the movant, repeated

13   failure to cure deficiencies by amendments previously allowed, undue prejudice to the

14   opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]"

15   Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty., 708 F.3d 1109, 1117 (9th Cir.

16   2013) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

17       A motion for leave to amend is addressed to the sound discretion of the court and

18   must be decided on the facts and circumstances of each particular case. Caddy-Imler

19   Creations, Inc. v. Caddy, 299 F.2d 79, 84 (9th Cir. 1962). "Where the plaintiff has

20   previously filed an amended complaint . . . the district court's discretion to deny leave to

21   amend is 'particularly broad.'" Miller v. Yokohama Tire Corp., 358 F.3d 616, 622 (9th

22   Cir. 2004) (quoting Chodos v. W. Publ'g Co., 292 F.3d 992, 1003 (9th Cir. 2002)).

Defendants argue granting leave to file another complaint would be prejudicial because they would be forced to bear significant expenses and withstand protracted litigation. Dkt. No. 112 at 14–15. Defendants point to having "already been forced to spend five years defending Bashir's unsupported allegations." Id. at 15. Prejudice to the opposing party "carries the greatest weight" and, absent prejudice or a "strong showing" under the other factors, there is a presumption in favor of granting leave to amend. See Eminence Cap., LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam); Wyshak v. City Nat. Bank, 607 F.2d 824, 826 (9th Cir. 1979) ("In the absence of prejudice to the opposing party, leave to amend should be freely given.").

Bashir's responses to Defendants' arguments are unpersuasive. Bashir contends Defendants cannot show prejudice because the parties are in the same position today as they were when the Court granted Bashir's last request for leave to file an amended complaint: the Court has not issued a scheduling order, the parties have not conducted discovery, and there is no evidence of undue delay, bad faith, or dilatory motive on the part of Bashir. Dkt. No. 111 at 24. None of these conditions are likely to change if the Court permits the filing of a third amended complaint, Defendants again move to dismiss, and Bashir requests leave to file a fourth amended complaint. Yet it cannot be so that Bashir, and plaintiffs similarly situated, are entitled to repeatedly amend pleadings without end.

The Court previously identified the deficiencies of the First Amended Complaint in its Order granting Defendants' first motion to dismiss. Bashir failed to cure several these deficiencies in his Second Amended Complaint. Critically, the allegations

supporting the first and third factors of the materiality analysis for Bashir's false certification claims went largely unchanged. Several of the regulations Bashir relies on are wholly inapplicable to the facts of this case. Piecemeal amendments to pleadings are inefficient and disfavored. See Cortese v. H&R Block Tax & Bus. Servs., Inc., 2015 WL 13918396, at *3 (C.D. Cal. Aug. 4, 2015) (stating that a prolonged series of incremental amendments to the plaintiff's complaint would subject the defendants to undue expense). Under Local Court Rule 15(a), this district requires a party who moves for leave to amend a pleading to attach a copy of the proposed amended pleadings as an exhibit to the motion. Bashir has neither provided such a copy to the Court nor identified what amendments he would make in his third amended complaint. See Dkt. No. 111 at 23–24.

Bashir's request for leave to file a third amended complaint, docket no. 111, is DENIED.

### III.  CONCLUSION

For the foregoing reasons, the Court ORDERS:

(1)     Defendants' Motion to Dismiss the Second Amended Complaint with prejudice, docket no. 104, is GRANTED.

(2)     The Clerk is directed to enter Judgment consistent with this Order, to send a copy of this Order and the Judgment to all counsel of record, and to CLOSE this case.

IT IS SO ORDERED.

Dated this 5th day of February, 2025.

Thomas S. Zilly
United States District Judge